**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **PLAINTIFF CV1 MOTHER, as Next Friend of and on behalf of PLAINTIFF CV1, a Minor Child,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | CIVIL ACTION NO. |
| **v.** | ) ) | |
| **ROCKY SHAY FRANKLIN, an individual; MG FREESITES, LTD, d/b/a "PORNHUB", a foreign entity; MG FREESITES II LTD, a foreign entity, MINDGEEK S.A.R.L., a foreign entity; MINDGEEK USA, INCORPORATED, a Delaware corporation; MINDGEEK CONTENT RT LIMITED, a Foreign entity; 9219-1568 QUEBEC INC. d/b/a MINDGEEK, a foreign entity; MG BILLING LTD, a foreign entity,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ***JURY TRIAL DEMANDED*** |
| **Defendants.** | ) | |

**COMPLAINT FOR DAMAGES**

Plaintiff CV1 Mother, as next friend of and on behalf of CV1, a minor child ("Plaintiff"), hereby files this Complaint for Damages ("Complaint) against Defendants Rocky Shay Franklin (Defendant "Franklin"); MindGeek S.a.r.l., MG Freesites, Ltd., MG Freesites II, Ltd., MG Content RT Limited, 9219-1568 Quebec, Inc., MindGeek USA Incorporated; MG CY Holdings LTD, and MG Billing LTD (collectively, "MindGeek Defendants", all Defendants referenced as "Defendants"). In further support, the Plaintiff states as follows:

## INTRODUCTION

1.      This lawsuit concerns perhaps one of the most disturbing courses of conduct imaginable: the exploitation of child molestation for profit. The MindGeek Defendants are those entities who utilized their platform(s) in collaboration with Defendant Franklin to disseminate obvious images and videos of child molestation, thereby profiting from their dissemination.

2.      Plaintiff CVI was a minor child and a victim of childhood sexual victimization and trafficking. Videos and images depicting this egregious victimization were crime scenes sold, marketed, managed, possessed, and/or disseminated by websites, internet infrastructure, and/or web-based platforms (collectively, "platforms") owned, operated, supervised, managed and/or controlled by the MindGeek Defendants.

3.      Make no mistake – this lawsuit does not concern the voluntary act of consensual sex between adults, with the distribution occurring through their consent. The victims depicted in these images were *obviously* children.  The dissemination of these videos to millions of viewers across the world continued notwithstanding law enforcement's pleas to take them down because they contained child pornography.

4.      The Plaintiff brings this action against Defendants, who monetized child trafficking and sexual victimization. The Plaintiff CVI was under eighteen years of age when depicted in commercial sex acts and child pornography, which was then made available for viewing on the MindGeek Defendants' platforms in violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1591 and 1595, amongst many other state and federal laws.

5.      The Plaintiff seeks all relief provided by the actions referenced in this Complaint, and for all damages and relief the Court deems appropriate and just under the circumstances.

## THE PARTIES

**6.**     **Plaintiff CV1** is a minor child under Alabama law and is a resident of Andalusia, Covington County, Alabama. CV1 is a victim of child sex trafficking and child pornography, pursuant to TVPRA and other state and federal statutes, and was molested and videotaped, the videos and images of which were later disseminated on the MindGeek Defendants' platforms.

**7.**     Due to the sensitive, private, and potentially retaliatory nature of CV1's allegations, we respectfully request that this Court permit him to be referred under a pseudonym, here "CV1". Courts recognize an exception to the general rule that pleadings name all parties when the issues involved are of a sensitive and highly personal nature. For good cause shown, the Court may permit CV1 to proceed in pseudonym to protect a party from annoyance, embarrassment, oppression, or undue burden or expense. Here, granting pseudonym status is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from his family, friends, employer, and community, if his true identity is revealed in the public record.

**8.**     **Plaintiff CV1 Mother**, as next friend of CV1, is the biological mother of CV1 and the legal guardian of CV1. Plaintiff CV1 Mother is over the age of 19 years and is a resident of Andalusia, Covington County, Alabama. As referenced below, given the overwhelmingly traumatic and sensitive nature of this action, CV1 Mother respectfully moves this Honorable Court to appoint a legal guardian to represent the interests of CV1 for purposes of this litigation and any future resolution of this matter.

**9.**     Due to the sensitive, private, and potentially retaliatory nature that could occur if CV1 were identified, and the potential that CV1 could be identified through his relationship with CV1 Mother, we respectfully request that this Court permit her to be referred under a pseudonym

3

as well, here "CV1 Mother". Courts recognize an exception to the general rule that pleadings name all parties when the issues involved are of a sensitive and highly personal nature. For good cause shown, the Court may permit CV1 Mother to proceed in pseudonym to protect a party from annoyance, embarrassment, oppression, or undue burden or expense. Here, granting pseudonym status is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from his family, friends, employer, and community if his true identity is revealed in the public record.

10.    Defendant **Rocky Shay Franklin** ("Franklin") is a resident of Greenville, Butler County, Alabama, and further entered into a contractual relationship with the MindGeek Defendants in the Middle District of Alabama to distribute illegal and sexually violent images of Plaintiff CV1 for profit.

11.    Defendant **MindGeek S.a.r.l.** is a foreign entity conducting business throughout the United States and Alabama, including within the Middle District of Alabama. MindGeek S.a.r.l., formerly known as ManWin, is the convergence of the two large pornography companies, Mansef and Intertube. Over the last decade, MindGeek S.a.r.l. went on an acquisition spree buying up its competition and now owns and operates over 100 pornographic websites, production companies, and brands. MindGeek S.a.r.l. has, for all intents and purposes, is believed to own and/or control the majority of the pornography on the Internet, much of which it distributes for free to any person with a web connection. Although incorporated in Luxemberg, MindGeek S.a.r.l.'s principal place of business is Montreal, Canada, with satellite offices in, among other places, San Diego, Los Angeles, San Francisco, London, Bucharest (Romania), and Nicosia (Cyprus).

12.     Defendant **MG Freesites, Ltd.** is a foreign entity incorporated in the Republic of Cyprus conducting business throughout the United States and Alabama, including within the Middle District of Alabama. Upon information and belief, MG Freesites, Ltd. Is a wholly owned subsidiary of MindGeek S.a.r.l, either directly or through intermediary companies that are also under the control of MindGeek S.a.r.l. Upon information and belief, MG Freesites, Ltd. Is predominantly under the control of and operated by directors, officers, and employees working in MindGeek's offices in the United States and Canada, with little business operations being conducted within the Republic of Cyprus where MG Freesites, Ltd. Is incorporated.

13.     Defendant **MindGeek USA Incorporated** is a corporation incorporated in the State of Delaware, with its principal place of business in Los Angeles, California. Upon information and belief, MindGeek USA Incorporated is a wholly owned subsidiary of MindGeek S.a.r.l., either directly or through intermediary companies also under the control of MindGeek S.a.r.l.

14.     Defendant **MG CY Holdings** is a foreign entity incorporated under the laws of the Republic of Cyprus conducting business throughout the United States and Alabama, including within the Middle District of Alabama.

15.     Defendant **Mindgeek Content RT Limited** is a foreign entity incorporated under the laws of Ireland conducting business throughout the United States and Alabama, including within the Middle District of Alabama. Upon information and belief, Mindgeek Content RT Limited owns, operates, and/or manages one or several of the websites.

16.     Defendant **9219-1568 Quebec Inc., d/b/a "MindGeek"**, is a Montreal-based company conducting business throughout the United States and Alabama, including within the

Middle District of Alabama. Upon information and belief, 9219-1568 Quebec Inc. employs between 750 and 999 employees with a portfolio of pornographic websites.

17.     Defendant **MG Billing LTD** is a foreign entity incorporated under the laws of Ireland conducting business throughout the United States and Alabama, including within the Middle District of Alabama. Upon information and belief, MG Billing LTD owns, operates, and/or manages the subscription services for one or several of the pornographic websites.

18.     Defendants MindGeek S.a.r.l., MG Freesites, Ltd., and MindGeek USA Incorporated, as well as all of these entities' subsidiaries and sister companies, are collectively referred to as "MindGeek" or the "MindGeek Defendants" herein.

19.     Collectively, "MindGeek Defendants" and/or "MindGeek" refers to MindGeek S.a.r.l., MG Freesites, Ltd., MG Freesites II, Ltd., MG Content RT Limited, 9219-1568 Quebec, Inc., MindGeek USA Incorporated; MG CY Holdings LTD, MG Billing LTD, and all of their parents, subsidiaries and affiliates.

20.     Upon information and belief, MindGeek has incorporated dozens of subsidiaries and sister companies around the world for the purpose of avoiding liabilities and to hide the identity of the entities and individuals behind its corporate actions. Upon information and belief, MindGeek S.a.r.l. and all other MindGeek entities operate as a single business enterprise solely dedicated to producing, distributing, and monetizing pornography on the Internet. In doing all acts alleged herein, and as a business generally, the MindGeek Defendants, and all of their subsidiary and sister companies, were and are alter egos of one another.

21.     Upon information and belief, and in particular, the MindGeek Defendants: (a) commingled their funds and other assets, failed to segregate funds between them, and have without authorization diverted corporate funds and assets for noncorporate uses; (b) treated each other's

6

assets as their own; (c) issued shares of one other to themselves and third parties haphazardly and without authority; (d) held themselves out as being personally liable for the debts of each other; (e) failed to maintain minutes and corporate records, and confused the records of the separate entities; (f) used the same business locations and employed the same employees; (g) failed to adequately capitalize the entities; (h) used each other as a conduit for a single venture of themselves; (i) failed to maintain arm's length relationships among themselves; and (j) diverted assets without consideration from/to one another to the detriment of creditors, including Plaintiffs. Recognition of the privilege of separate existences between the MindGeek Defendants would promote injustice, unfairness, and fraud. Any separateness is to be disregarded. As such, these defendants are jointly and severally liable in this action as alter egos.

22.     In doing all things alleged herein, the MindGeek Defendants were agents, servants, representatives, partners, joint venturers, affiliates, parents, subsidiaries, and/or employees of each other in the acts and/or omissions herein alleged. The MindGeek Defendants were acting within the course and scope of their authority as such agents, servants, representatives, partners, joint venturers, affiliates, parents, subsidiaries, and/or employees and with the permission, authorization, consent, and ratification of each other.

23.     MindGeek and its subsidiaries have utilized the United States judicial system to enforce their intellectual property, contractual rights, and other rights relating to the business they systematically and routinely conduct within the United States and Alabama, including within the Middle District of Alabama, which includes their pornographic websites.

24.     The MindGeek Defendants, together and individually, facilitated and financially benefited, from sex trafficking ventures between the MindGeek Defendants and others, including CV1's sex trafficking, in violation of TVPRA.

25.     Sex traffickers and the MindGeek Defendants worked together to earn a profit from commercial sex acts and child pornography involving the Plaintiff.

## JURISDICTION AND VENUE

### SUBJECT MATTER JURISDICTION

26.     This Court has original subject matter jurisdiction over the claims raised in this Complaint, including, but not limited to, for victims of sex trafficking under 18 U.S.C. § 1591, 1595(a) ("An individual may bring a civil action…in an appropriate district court of the United States…"), as well as for violations referenced in 18 U.S.C. § 2252, 2255.

### PERSONAL JURISDICTION

27.     This Court has personal jurisdiction over all defendants referenced in this Matter. The MindGeek Defendants interacted with, transacted business with, and/or transmitted currency with Alabama residents, including Defendant Franklin – a resident of 349 Gravel Hill Road in Greenville, Alabama –  for purposes of doing business in the State of Alabama and with Alabama residents.

28.     Moreover, the MindGeek Defendants operate various websites and transact various forms of business in Alabama, whereby the Defendants purposefully availed themselves of doing business in the State of Alabama. Among other things, the Defendants purposefully: (a) directed their activities at Alabama residents; (b) derived benefit from their activities in Alabama; (c) derived benefit from their victimization of Alabama residents; (d) created a substantial connection with Alabama; (e) engaged in significant activities within Alabama; (f) created continuing obligations between themselves and residents of Alabama; and (g) caused liability-producing acts and foreseeable consequences in Alabama.

29.     Further, there exists personal jurisdiction as the MindGeek Defendants were and are agents, partners, alter egos, ratified the conduct, and have substantial control of and over MindGeek USA Incorporated, a United States entity.

30.     Defendants contracted and partnered with forum-based perpetrators of the subject child pornography and rape to split revenues that Defendants generated by marketing, selling, and exploiting videos featuring victims of the conduct referenced in the Complaint.

31.     The MindGeek Defendants have regular and continuous contact with Alabama residents through their website that allows Alabama residents to deal directly with the MindGeek Defendants.

32.     Furthermore, the Defendants have specific business contacts with the United States and the State of Alabama, including but not limited to (1) through their complex corporate structure, they have developed, designed, produced, advertised, and distributed pornographic content throughout the world, the United States, and Alabama; (2) the United States has the highest daily traffic on Pornhub, the MindGeek Defendants'' platform; (3) Alabama users rank second in the nation in time spent per visit on Pornhub; (4) much of Pornhub's content is hosted on U.S.-based servers; (5) sexually explicit videos of CV1 remained on the MindGeek Defendants'' platform(s) for at least five (5) months and were available for view and download all around the world, within the United States, and the State of Alabama; (6) sexually explicit videos of CV1 continued to remain on the Defendants' platform(s) notwithstanding requests from law enforcement to remove them from public viewing; and (7) the Defendants have profited specifically from people in Alabama viewing videos of CV1's molestation.

33.     The MindGeek Defendants have sufficient contacts with the State of Alabama and engage in continuous and systematic business in the State of Alabama and continue to generate significant profits from their intended and purposeful business in Alabama.

34.     The MindGeek Defendants have advertised through the world wide web and other media in Alabama with a goal towards expanding the markets for its products and services to all of the United States, including in Alabama.

35.     The MindGeek Defendants profit from videos recorded and/or uploaded in the State of Alabama, including videos uploaded by Modelhub members who are Alabama residents, such as Defendant Franklin.

36.     The MindGeek Defendants receive significant revenue from their videos and websites within the state of Alabama, with Alabama users ranking second in the nation in time spent per visit to Pornhub.

37.     The MindGeek Defendants have regular and continuous contact with Alabama residents through their website that allows Alabama residents to deal directly with the MindGeek Defendants.

38.     The injuries to Plaintiffs in this case relate to and/or are the result of activities with continuous contacts within the state of Alabama by Defendants.

39.     The MindGeek Defendants entered into a contract and/or joint venture with Defendant Franklin in Alabama, for the purpose of carrying out their for-profit collaborative dissemination of sexually violent images of Plaintiff CV1.

**VENUE**

40.     Venue is proper in the United States District Court for the Middle District of Alabama pursuant to 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(2), and (d) in that a substantial part of

the events or omissions giving rise to the claims occurred in this district, as well as other connections Defendants have with this District subject them to personal jurisdiction in this District. Particularly, the relationship with Defendant Franklin and the MindGeek Defendants was formed in Greenville, Alabama, and Defendant Franklin is a resident of Greenville, Alabama, amongst the many other ties between the Defendants and this venue.

41.    Moreover, the MindGeek Defendants contracted with and maintained a business partnership with Defendant Franklin of the subject abuse within this District, and upon information and belief, made payments to Franklin within this judicial district as part of that relationship.

42.    Finally, the Plaintiff resides in this judicial district.

## **FACTS**

### **BACKGROUND**

43.    In 2000, the United States Congress passed the Trafficking Victims Protection Act ("TVPA"). The TVPA was the first comprehensive law in the United States to penalize the full range of human trafficking offenses,[1] including sex trafficking of children under the age of 18 or sex trafficking by force, fraud, or coercion.[2]

44.    Congress reauthorized the TVPA in 2003.[3] In doing so, the Trafficking Victims Protection Reauthorization Act ("TVPRA") created a civil cause of action, codified 18 U.S.C. § 1595.[4]

---

[1] *See* Victims of Trafficking and Violence Protection Act of 2000. Pub. L. No. 106-386, § 102(a), 114 Stat. 1464, 1467 (2000).
[2] *See* 18 U.S.C. § 1591(a).
[3] *See* Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875, 2878 (2003), available at https://www.gpo.gov/fdsys/pkg/STATUTE-117/pdf/STATUTE-117-Pg2875.pdf (Last checked July 6, 2022).
[4] *See* 18 U.S.C. § 1595(a).

45.     The TVPRA permits a party to bring a civil claim against perpetrators and against persons or entities who, although not the direct perpetrator, knowingly benefits from participating in what they should know was a sex trafficking venture.[5]

46.     During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity.  It ought to concern every community, because it tears at our social fabric.  It ought to concern every business, because it distorts markets.  It ought to concern every nation, because it endangers public health and fuels violence and organized crime.".[6]

47.     Statistics released in 2014 by the International Labor Organization ("ILO") showed that approximately 4.5 million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of $99 billion dollars for sex traffickers worldwide.[7]

48.     The United States Department of Justice estimates that pornographers have recorded the abuse of more than one million children in the United States.[8]  The Internet has radically changed how child pornography is reproduced and disseminated according to the United States Department of Justice. "The expansion of the Internet has led to an explosion in the market for child pornography, making it easier to create, access, and distribute these images of abuse. While 'child pornography' is the term commonly used by lawmakers, prosecutors, investigators and the public to describe this form of sexual exploitation of children, that term largely fails to

---

[5] *Id.*

[6] President Barack Obama, *Remarks to the Clinton Global Initiative* (Sept. 25, 2012), (transcript available at https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative)  (Last checked July 6, 2022).

[7] *See* International Labour Office, *Profits and Poverty: The Economics of Forced Labour* at 13 (2014), https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf (Last checked July 6, 2022).

[8] *See* Roger J.R. Levesque, *Sexual Abuse of Children: A Human Rights Perspective*, at 66 (Ind. Univ. Press 1999).

describe the true horror that is faced by hundreds of thousands of children every year. The child victims are first sexually assaulted in order to produce the vile, and often violent, images. They are then victimized over and over again each time images of their sexual assault are traded over the Internet in massive numbers by like-minded people across the globe."[9]

49.    In the United States, the National Center for Missing and Exploited Children ("NCMEC") serves as the national clearinghouse for child pornography/child sexual abuse material ("CSAM") reports.  NCMEC was created by an Act of Congress and is federally funded. NCMEC operates the "CyberTipline," which gathers reports of child sexual exploitation (including child pornography, online enticement, and contact offenses). The CyberTipline provides an online mechanism for members of the public and electronic service providers to report incidents of suspected child sex trafficking or child sexual abuse images. In 2019, the CyberTipline processed 16.9 million reports and approximately 21 million reports in 2020. NCMEC also operates the U.S. Child Victim Identification Program and, as of 2019, it had reviewed more than 312 million images and videos of child sexual abuse material.[10]

50.    NCMEC maintains a hash-sharing system and database that allows companies like MindGeek, if they wanted, to check all videos / images against the database to ensure they are not hosting CSAM and that no known CSAM images/videos could be reuploaded in the future.

51.    In March 2020, after years of being confronted with allegations that CSAM was being created, harbored, facilitated and generating profit, MindGeek decided to turn over 4,171 videos to NCMEC.

---

[9] *See* U.S. Department of Justice, *The National Strategy for Child Exploitation and Human Interaction: A Report to Congress*, at 3 (Aug. 2010), https://www.justice.gov/psc/docs/natstrategyreport.pdf (Last checked July 6, 2022).
[10] *See* National Center for Missing & Exploited Children, *Child Sexual Abuse Material (CSAM)*, https://www.missingkids.org/theissues/csam (Last visited July 6, 2022).

52.    In February 2021, MindGeek finally agreed to use the NCMEC hash-sharing database, but as of the end of February 2021, MindGeek had not yet accessed the system to check if any of the videos in their library (whether then available on their site, or those removed but still in their possession) matched those in the database qualifying as known CSAM, requiring the video be removed and turned over to NCMEC to prevent future uploading and to abide by U.S. child pornography laws.

53.    On January 31, 2020, President Trump entered Executive Order #13903, entitled "Combating Human Trafficking and Online Child Exploitation in the United States."[11] The Order stated: "Human trafficking is a form of modern slavery. Throughout the United States and around the world, human trafficking tears apart communities, fuels criminal activity, and threatens the national security of the United States. It is estimated that millions of individuals are trafficked around the world each year—including into and within the United States." It further stated that "Twenty-first century technology and the proliferation of the internet and mobile devices have helped facilitate the crime of child sex trafficking and other forms of child exploitation. Consequently, the number of reports to the National Center for Missing and Exploited Children of online photos and videos of children being sexually abused is at record levels."[12]

---

[11] *See* Exec. Order No. 13903, 85 Fed. Reg. 6721, 6721-6723 (Jan. 31, 2020), https://www.federalregister.gov/documents/2020/02/05/2020-02438/combating-human-trafficking-and-online-child-exploitation-in-the-united-states (Last checked July 6, 2022).

[12] *Id.*

**COMMERCIAL SEX ACTS INVOLVING MINOR CHILDREN IS SEX TRAFFICKING**

54.     Under 18 U.S.C. § 1591(e)(3), the term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person. 18 U.S.C. § 1591(e)(3).

55.     Section 1591(a)(1) and (a)(2) make it a crime to benefit, financially or by receiving anything of value, from participation in a venture which knowingly recruits, entices, harbors, transports, provides, obtains, maintains, patronizes, or solicits by any means a person for commercial sex, where the person is under 18, or induced by force, fraud, or coercion. 18 U.S.C. § 1591(a)(1).

56.     The TVPRA, as amended in 2008, improved a victim's ability to hold traffickers accountable by eliminating the requirement to prove a particular defendant knew a sex trafficking victim was a minor, in cases where the defendant had a reasonable opportunity to observe the minor.   The TVPRA also significantly expanded the civil cause of action to include those who financially benefit from what they know or should know is sex trafficking.

57.     In 2018, Congress passed a bill known as Fight Online Sex Trafficking Act ("FOSTA") and Stop Enabling Sex Traffickers Act ("SESTA") (collectively, "FOSTA/SESTA") to amend 47 U.S.C. § 230, the Communications Decency Act, to clarify that it was never intended to provide immunity for websites facilitating illegal commercial sex acts with children or adult victims of human trafficking on websites. [13]   The FOSTA/SESTA amendment to Section 230 is retroactive, applying "regardless of whether the conduct alleged occurred, or is alleged to have occurred, before, on, or after … enactment." [14]

---

[13] Pub. L. 115–164, §2, Apr. 11, 2018, 132 Stat. 1253.
[14] *See* 132 Stat. 1253, §4(b). *See also Woodhull Freedom Found v. United States*, 948 F.3d 363,368 (D.C. Cir. 2020).

58.     Alabama has passed its own human trafficking act, entitled the Representatives Jack Williams and Merika Coleman Act, Ala. Code § 13A-6-150-160, whereby, amongst other things, one "knowingly benefits, financially or by receiving anything of value, from participation in a venture or engagement for the purpose of sexual servitude or labor servitude."

59.     Plaintiffs have sufficiently pled that they were victims of sex trafficking within the meaning of 18 U.S.C. § 1591 and are therefore entitled to bring a civil action under 18 U.S.C. § 1595.

60.     Moreover, Plaintiffs have sufficiently pled that they were victims of human trafficking under Ala. Code § 13A-6-150-160 and are therefore entitled to bring a civil action pursuant to Ala. Code § 13A-6-157 and recover any and all damages as contemplated therein.

<h3 style="text-align:center">THE DEFENDANTS' PLATFORMS THAT FACILITATE<br/>AND CREATE AN ENVIRONMENT FOR SEX TRAFFICKING OF MINORS</h3>

61.     The MindGeek Defendants include a number of intertwined and related entities; MindGeek has a complex corporate structure through which it has developed, designed, produced, possessed, advertised, and distributed pornographic content throughout the world and the United States, including specific business contacts with Alabama.

62.     The MindGeek Defendants own and control one of the largest and most-visited pornographic websites in the world, www.Pornhub.com ("Pornhub"), as well as www.YouPorn.com, www.RedTube.com, www.XTube.com, and www.Tube8.com. [15]

63.     In 2019, Pornhub averaged 115 million visits a day, and acquired 1.36 million hours (or 169 years' worth) of new content. [16]   6.83 million new videos were uploaded to Pornhub in

---

[15] *MindGeek*, www.mindgeek.com (Last visited July 6, 2022).
[16] *See* Pornhub Insights, *The 2019 Year in Review*, https://www.Pornhub.com/insights/2019-year-in-review (last visited Mar. 20, 2021).

2019.[17] "To put this in perspective – if you strung all of 2019's new video content together and started watching them in 1850, you'd still be watching them today!"[18] 39 billion searches were performed over 42 billion visits.[19]

64.     The United States remained by far the country with the highest daily traffic on Pornhub, with Alabama users ranking second in the nation in time spent per visit to Pornhub.

65.     According to the Canadian Centre for Child Protection, the majority of Pornhub's content is hosted on U.S.-based servers.[20]

### MINDGEEK'S ROLE IN CONTENT CREATION AND DEVELOPMENT

66.     As will be discussed in more detail below, throughout 2019, most of the videos and images on Pornhub, including those for CV1, were uploaded to the MindGeek Defendants' platforms with no attempt to verify the identification, age, or consent of the persons uploading or featured in them.

67.     In December 2020, MindGeek suspended "nine to ten million unverified users" form Pornhub.[21]

68.     Although Pornhub is a tube site, MindGeek does not rely exclusively on user-generated videos and images, but includes videos and images from a number of Content Partners, including Brazzers, Fake Taxi, and Kink.com,[22] and until recently, GirlsDoPorn, whose leaders

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] Canadian Centre for Child Protection, *An analysis of CSAM and harmful-abusive content linked to certain electronic service providers*, Project Arachnid: Online Availability of Child Sexual Abuse Material, at 32 (June 8, 2021), https://protectchildren.ca/pdfs/C3P_ProjectArachnidReport_en.pdf.
[21] *See*, Jordan Valinsky, *Pornhub removes a majority of its videos after investigation reveals child abuse*, CNN Business (Dec. 15, 2020, 12:24 PM), https://www.cnn.com/2020/12/15/business/Pornhub-videos-removed/index.html (Last visited July 6, 2022).
[22] *See* Pornhub, *Pornhub Network Content Partner Program*, https://www.Pornhub.com/partners/cpp (last visited Mar. 20, 2021).

now face sex trafficking charges for coercing women into producing pornography and earning money from doing it.[23]

69.     MindGeek owns some of the entities it describes as Content Partners, including Brazzers, Babes.com, Digital Playground, Reality Kings, and Twistys.[24]

70.     Pornhub admits that they create at least some videos and images on their website.[25] At the bottom of most pages, Pornhub includes this statement: "The Pornhub team is always updating and adding more porn videos every day."[26]

71.     Where MindGeek is not creating videos and images for content, it is developing, designing, and controlling videos, images, text, tags, advertising, and other aspects of its site in some fashion. MindGeek's business model is predicated on maximizing views and traffic to its site. It accomplishes this by tightly controlling through editing, creating, and modifying titles, tags, keywords, storylines, themes, and scenes of every single video on the site despite its source.

72.     As further described below, MindGeek actively controls how and what videos are posted; the discussions/comments surrounding particular videos and images; processes for viewing, posting, and creating accounts; and processes for encouraging and rewarding income and fees for downloaded and viewed content.

---

[23] *See* Samantha Cole & Emanuel Maigberg, *Pornhub finally removes girls do porn*, VICE (Oct., 19, 2019, 5:12 PM), https://www.vice.com/en_us/article/43kb5q/Pornhub-finally-removes-girls-do-porn (Last visited July 6, 2022).

[24] Pornhub, s*upra* note 19.

[25] *See, e.g., Malibu Media, LLC v. Doe*, 381 F. Supp. 3d 343, 355 (M.D. Pa. 2018) ("Moreover, the terms of Pornhub's license refer to 'our Works'—quite plainly referencing Pornhub's *original* works—and not to 'Content Posted by Users,' which the terms of use address separately. (defining 'our Works' as 'content we own, authored, created, purchased, or licensed' and 'Content' as user-submitted 'content, data, information, videos, images, recordings, materials, code or content of any kind').").

[26] *See generally* Pornhub, https://www.Pornhub.com.

73.     Pornhub maintains a 40-page instruction and direction guide, called "The Pornhub Playbook," advising how to make money from the site.[27]   Pornhub advises uploaders on what types of videos and images to post, specifically suggests keywords and categories, and will edit non-compliant posts.

74.     As discussed in great (and explicit) detail, Pornhub's instruction and direction guide is exacting.[28]

75.     Pornhub instructs its partners: "Pornhub users have certain expectations. Formatting content in a manner that will appeal to our audience is vital to generating more views and higher ratings." Pornhub then goes on to give scene by scene instructions, "Use compelling content (dialogue/story/reality) to start the video. If there is no storyline, then tease the viewer with a good action shot. The middle of the video should be composed of multiple hardcore action scenes and various sexual positions. For the clip's ending, make sure you go out with a bang! Videos that achieve the highest user ratings always end with [climax]."[29]

76.     The content guide also offers Content Partners further assistance if they want it: "Our knowledgeable and friendly team will walk you through every step of the way. Contact us and start promoting your brand today!"[30]

77.     Pornhub had a banned terms list, which stated: "Due to payment processor regulations, the rules are a bit stricter.  Here's a list of words you can't use in your video titles.  Also, if your videos contain any content that matches these descriptions, they'll be taken down as well."[31]

---

[27] *See generally* Pornhub, *The Pornhub Playbook: How to Make Money with Pornhub*, https://www.Pornhub.com/content_partner_guide.pdf (Last visited July 6, 2022).
[28] *Id.* at 5, 12-14.
[29] *Id.*
[30] *Id.* at 34.
[31] See Exhibit 1.

78.     The banned terms list is no longer available on Pornhub's website for general users but remained on the Modelhub FAQ page until June 2020.[32]  However, many of these terms still appear in the titles or tags of videos but in loosely concealed forms, such as a letter replaced with an asterisk, appearing in a different language, or represented by a term common to predators and exploiters looking for such videos and images. Often these searches within Pornhub also create related search terms so that the user can locate similar content.

79.     Either Pornhub content developers are replacing terms indicating illegal content with asterisks, rather than taking the content down, or they are allowing users to do so as they claim to review all posted content.[33]

80.     MindGeek creates and suggests tags for users. MindGeek requires users to choose a minimum number of tags from provided options when a new video is uploaded and when users choose certain tags MindGeek suggests related tags to increase traffic to the videos.

81.     Keywords and tags are essential for search engine optimization which drives users Googling pornographic content to MindGeek websites. MindGeek's business model is centered on designing, modifying, developing, and controlling content to maximize search engine optimization. MindGeek's website previously described itself as "A leader in IT, Web Development and SEO."[34] MindGeek boasts, "[w]ith over 100 million daily visitors to some of the world's largest trafficked websites, we're uncovering trends and user habits overnight that takes others months to gather."[35]  MindGeek has a "Search Engine Marketing" team dedicated to "develop[ing] successful strategies to ensure top-ranking in search engine traffic."[36]

---

[32] *Id.*

[33] *See* Pornhub, *Answers to Community Questions*, https://www.Pornhub.com/blog/10012 (last visited Mar. 2020).

[34] Mindgeek, *About*, https://www.mindgeek.com/about/ (Taken from Mar. 20, 2021 site).

[35] *Id.*

[36] Mind Geek, *Services at Mind Geek: Search Engine* Marketing, https://www.mindgeek.com/services/, (Last visited July 6, 2022).

82.     MindGeek ensures uploaders use the keywords, tags, and titles that increase SEO, and profits, by collecting and actively placing data regarding these in multiple places on their websites, through blogs to uploaders,[37] the instructions and requirements for Modelhub members, verified users, and Content Partners, as well as the mandate to MindGeek formatters, those in charge of reviewing and editing content, to add tags to videos and change titles described in more detail supra. MindGeek even penalizes those who use titles, tags, or categories incorrectly, threatening a "loss of earnings."[38] Because MindGeek controls the flow of money to Modelhub members and Content Partners, they can force compliance with content creation according to their specific parameters.

83.     MindGeek closely tracks and publishes data surrounding traffic, keywords and search terms. For example, MindGeek publishes a yearly review with a section dedicated to most popular search terms.[39] MindGeek runs a "Pornhub Insights" blog which includes detailed articles about traffic on their site including a "Tech Review" breaking down traffic from different countries around the world and analyzing data broken down by device,[40] and traffic related to search terms and current events such as the 2020 election.[41] MindGeek operates a so-called "wellness" blog titled "PornMD" even compiles the most popular search terms by sexual orientation, categorized alphabetically and by website.[42] This blog runs a live ticker at the top of the page showing current searches as they are occurring on MindGeek websites in real time. You can also watch the searches live on a separate webpage and filter by country and sexual orientation.[43]

---

[37] Andy, *Marketing for* Models, Modelhub (last visited Mar. 20, 2021), https://www.Modelhub.com/blog/6601.
[38] *See* attached Exhibit 2.
[39] Pornhub, *supra* note 12.
[40] Id.
[41] Pornhub, *2020 Election Week Searches*, Pornhub Review (Nov. 6, 2020), https://www.Pornhub.com/insights/2020-election-week-searches.
[42] PornMD, *Most Popular*, https://www.pornmd.com/straight/most-popular (last visited Oct. 2020).
[43] *Id.*

84.     This data regarding search terms demonstrates that the keywords "teen"[44] and "amateur"[45] are consistently the top search terms in North America for Pornhub. Both of these keywords are associated with CSAM and victims of non- consensual sexual activity or non-consensually shared content and MindGeek knows this.

85.     MindGeek explains the popularity of the term "amateur" through their employee Dr. Laurie Betito: "It seems that people are looking for more realistic depictions of sex. 'Real' people vs. actors seems to be the draw. It's interesting that more and more people are putting themselves out there as amateurs. Sex has become so much less taboo that those who get a kick out of exhibitionism can do so with very little experience or equipment. The message is: anyone can be a porn star!"[46]

86.     MindGeek's focus on certain keywords and tags, and its creation of related search terms, has resulted in MindGeek websites regularly appearing among the top results for virtually any pornography-related Google search, and even for searches unrelated to pornography but which contain certain keywords.[47] This search engine optimization is what made Pornhub one of the most popular pornography websites in the world.

87.     By way of example, as recent as July 5, 2022, the search terms "step uncle" and "nephew", which are also relevant to the present case and raise serious alarms of child exploitation – although not necessarily pornographic as traditionally used, directed Google searchers to the MindGeek Defendants' platform(s) as the top listings, showing yet again the monetary incentive of the MindGeek Defendants and their effectiveness in driving traffic to monetization:

---

[44] Pornhub, *supra* note 12.
[45] *Id.*
[46] *Id.*
[47] Attached Exhibit 3.



88.     MindGeek creates a graph or timeline and places it underneath videos to demonstrate the level or intensity of activity within the video.   This action by MindGeek  helps the viewer identify and quickly advance to various levels of sexual activity within the video.   Upon

information and belief, MindGeek harvests this data to optimize its ad placement and to otherwise
monetize on the viewer's viewing habits and addictions.



89.     Many videos available on Pornhub also contain buttons created by MindGeek and
added to sections within the timeline or graph.  These buttons assist viewers in skipping ahead to
various parts of the video that pique their interests.  Upon information and belief, these efforts by
MindGeek are yet another way to optimize profit sharing, ad placement, and otherwise capitalize
on the data learned by capturing the viewer's preferences.

90.     MindGeek creates thumbnails for the videos on its site and stores them on a separate
server. This includes thumbnails created from CSAM videos. Thumbnails are a key component to
attracting viewers to a video and MindGeek knows this as it advises its content partners, "After
uploading a new video, a notification will appear in your profile when thumbnails are ready to be
selected. A well-chosen thumbnail will greatly impact the number of views by making videos more
appealing for users to click on."

91.     MindGeek generates these thumbnails from uploaded videos and allows the
uploader to choose from within the MindGeek created set.[48]  In this way, MindGeek requires
thumbnails for every video. MindGeek only allows their Content Partners or videos for sale or with

_____

[48] https://help.pornhub.com/hc/en-us/articles/115007986967-Video-Thumbnails.

a download price to upload custom thumbnails, and even these are strictly controlled by MindGeek, and must comply with the following requirements:

> Any text, Logos or superimposed images cannot be larger than 1/3 of the thumbnail. Actions portrayed in the thumbnail MUST appear in the video. e.g. If the thumbnail depicts a blowjob, the video must contain a blowjob scene. Fake elements like play buttons are not permitted on thumbs. Specialty Thumbs that are permitted: Promo Shots; An image that doesn't necessarily happen in the video, but was taken to promote the video. Think, girl's surprised face at huge penis or Large guy standing next to tiny girl to demonstrate contrast. Compositions; a collage of multiple parts of the video. Same rules from above will apply.[49]

92.     MindGeek offers several profit sharing programs with uploaders including, but not limited to, the Modelhub program, and the Content Partner Program.

93.     MindGeek maintains continuous business relationships with members of both programs in the form of granting them an elevated status on the site, promotion of their content, greater control and development of their content, support services, resources to assist their viewership and profit sharing. MindGeek splits advertising revenue and takes a direct cut from paid content and tips for Modelhub members and splits advertising revenue with Content Partners.

94.     MindGeek's Content Partners included GirlsDoPorn, a channel that had more than 600 million views, where women were told they were being considered for modeling jobs and flown to San Diego.[50]  The perpetrators gave the women drugs and alcohol, rushed them to sign the contracts, and in some cases threatened them with legal action if they backed out, or prevented them from leaving until they did the scenes.

---

[49] Pornhub, *supra* note 27.
[50] Pauline Repard, *22 women win $13 million in suit against GirlsDoPorn videos*, Los Angeles Times (Jan. 2, 2020), https://www.latimes.com/california/story/2020-01-02/lawsuit-girlsdoporn-videos (Last visited July 6, 2022).

95.     One male performer from GirlsDoPorn was convicted and sentenced to 20 years in prison for sex trafficking and conspiracy to commit sex trafficking in June 2021,[51] a cameraman pled guilty to conspiracy to commit sex trafficking in January 2021,[52] and an administrative assistant, who provided travel arrangements and transportation for the victims, pled guilty to conspiracy to commit sex trafficking in April 2021.[53]

96.     MindGeek waited more than two years after the civil lawsuit was filed[54] until GirlsDoPorn owners were indicted – to remove the sex trafficking channel,[55] and people could still access the videos as late as December 2020.[56] In the meantime, MindGeek continued to profit from the sex trafficking videos' views or any increased traffic to and within its website linked to these videos.

97.     Another long time Content Partner of MindGeek was "Czech Casting," which has since been shut down as nine people associated with the channel were arrested for human trafficking, sexual coercion, and rape in July 2020.[57] This was a highly successful channel on Pornhub with over 79 million views and boasted "[t]he largest casting on Earth!" The owners of this channel had several channels on Pornhub collectively garnering almost 1 billion views.[58]

---

[51] United States Attorney's Office S.D. Cal., *Twenty-Year Sentence in GirlsDoPorn Sex Trafficking Conspiracy,* United States Department of Justice (June 14, 2021), https://www.justice.gov/usao-sdca/pr/twenty-year-sentence-girlsdoporn-sex-trafficking-conspiracy (Last visited July 6, 2022).

[52] *Id.*

[53] *Id.*

[54] Pornhub still had GirlsDoPorn as a Content Partner in August 2019. Samantha Cole, *supra* note 18. The first complaint was filed in March 2017. *See* Second Am. Compl. *Jane Doe Nos. 1- 22, v. GirlsDoPorn.Com,* No. 37-2016-00019027 (Cal Super. Ct. 2020). The complaint alleged conduct that violated federal sex trafficking statutes, though it did not contain a direct claim for sex trafficking beneficiary claim.

[55] *See* Sean Hollister, *Pornhub removes GirlsDoPorn, finally drawing a line at sex trafficking charges*, The Verge (Oct. 14, 2019), https://www.theverge.com/2019/10/14/20914593/Pornhub-girls-do-porn-mindgeek-remove-channel-videos (Last visited July 6, 2022). Those responsible for GirlsDoPorn were indicted in October 2019.

[56] Complaint, *supra* note 37, ¶ 73. [THIS NEEDS TO CHANGE TO FIT OURS]

[57] *See* Prague Morning, *Czech Casting: Women Lured By Modeling Gigs, Manipulated Into Shooting Porn* (July 18, 2020), https://www.praguemorning.cz/czech-casting-women-lured-by-modeling-gigs-manipulated-into-porn/ (Last checked July 6, 2022).

[58] *See* Exhibit 4.

98.     Modelhub is a MindGeek company that offers the "amateur" pornographer various methods to upload content and create view-based revenue on Pornhub, Pornhub premium, and Modelhub.

99.     Pornhub added over 98,000 new members in 2019 to its Modelhub program bringing the total to around 130,000. [59]  In addition to ad revenue, MindGeek controls and shares in all of Modelhub Models' earnings, with models receiving up to 65% of on-demand videos, 80% of revenues from fan-only videos, [60] and 80% of any tips. [61]  Pornhub takes a portion of the money, including tips, in addition to a 15% processing fee. [62]

100.    Pornhub sets the payment cap for "models" and writes: "In the event you violate any part of these Terms of Services, you violate any third party right, including without limitation any copyright, property, or privacy right, or where a third-party claims that all or any part of your Content caused it damage, we may, in our sole discretion, withhold indefinitely payments to you." [63]

101.    Essentially, MindGeek moderators eyeball the performers in the video to see if they look young. If the performer is a child under the age of 12, it may be more likely that a moderator would flag that video or image.  However, if the performer is 15, 16, 17, the moderator may be less likely, and less inclined, to flag that video or image.

102.    MindGeek asks amateurs to fill out an online form stating what type of requests the amateur is willing to take. Further, competitions for cash and prizes are promoting riskier behaviors that are encouraged by Pornhub based on what users are searching for. [64]

---

[59] Pornhub, *supra* note 12.
[60] *See* Modelhub, *Terms and Conditions,* https://www.Modelhub.com/information/terms (visited on Mar. 20, 2021).
[61] *See* Pornhub, *Earnings and Payments*, https://help.Pornhub.com/hc/en-us/articles/360046090414-Earnings-and-Payments (visited on Mar. 20, 2021).
[62] *Id.*
[63] Modelhub, *supra* note 59.
[64] *See* Chase Renier, *How to Make Money On Pornhub (Simple Guide to Making Your First*

**103.**     Consistent with MindGeek's material contributions on their site, they provided a 15-page "How to Succeed" instruction and directive for Modelhub members, as well as detailed "Help" and "FAQ" pages on their website to ensure even these "amateur" uploaders include the scenes, activity, keywords, tags, and titles that MindGeek knows successfully generates traffic to videos.

**104.**     MindGeek ensures that these "guidelines" are followed by controlling the earnings with Modelhub members.

**105.**     For example, MindGeek threatens removal of earnings if a model uses a tag, category, or title for a video that does not contain the action represented in the video.  (MindGeek does not threaten to remove the video itself for non-compliance, suggesting instead that they will profit from continuing to show the video, without allowing the model to do so).

**106.**     Additionally, MindGeek explains, "We pay out a high percentage (80%+) of the ad revenue that your videos earn. Your earnings are based on the views of your video times the ad rate. The ad rate is calculated based on the performance of the ads around your video (clicks, user country, sales)."[65] MindGeek knows from years of data mining what increases traffic, and they tell Modelhub members in detail the content, titles, keywords, and tags their videos need to contain to drive this traffic. The message and operation is clear: follow these rules and you get paid.

**107.**     For custom videos, which can be requested by "fans", MindGeek generates the form and the available options for the uploader to choose from, to craft a request from their "fans". For example, the uploader can choose from a variety of MindGeek-generated sex acts in the "extras"

---

*$100)*, Black and White Ninga (May 6, 2019), https://www.blackandwhite.ninja/blog/how-to-make-money-on-Pornhub.

[65] *See* Pornhub, *Model Payment Program: How to Succeed*, https://bs.phncdn.com/misc/images/How%20to%20Succeed.pdf.

section of the MindGeek created form, and then this becomes the request form Modelhub "fans" use to request custom videos. Through these forms, MindGeek controls video length, resolution, content, and delivery time for "custom" videos requested by fans, and then takes 35% of the profits. [66]

108.    MindGeek's Modelhub guide also did not require uploaders or users to verify the age or consent of co-performers in the video at the time of upload. Instead, MindGeek only "strongly recommend[ing]" that a co-performer agreement be kept by the uploader if there are others in the video, in order to "take all necessary actions to protect both yourself and your content." [67]

109.    MindGeek further instructs that "if you forget to identify yourself in the upload process" (much less any co-performer, rape victim, or non-consenting participant), just email Modelhub. [68]

110.    MindGeek knew or should have known that it was profit sharing with sex traffickers on its site as evidenced by some examples of content that MindGeek has verified, distributed, and monetized through Modelhub:

    A.  Verified Model "Suga Daddy Zo" films his commercial sex encounters with real
        prostituted persons. The description of his channel reads, "On this channel I
        [f**k] all kinds of prostitutes. Street Walkers, Online Hos, Everyday working
        Hos, they all get [f****d] here." [69] Many of his videos are shot in his car with
        titles such as, "On the Hunt for Hos (The Lost Tapes of Ep. 11) Run-a-way
        teen," [70] "On the Hunt for Hos Ep. 16 (Kelvyn Park High School Teen) Barely
        Legal". [71] His videos have 9.7 million views, and he has 21,000 subscribers. It
        is clear that this "Verified Model" is not submitting the name, age verification
        or any other information on the women he is exploiting in these videos and yet

---

[66] See Pornhub, *Custom Videos*, https://help.Pornhub.com/hc/en-us/articles/360013666833-Custom-Videos (visited on Mar. 20, 2021).
[67] Pornhub, *supra* at 59.
[68] See, Pornhub, Models, www.Pornhub.com/partners/models (last visited Feb. 7, 2021).
[69] See Pornhub, *Pornstars*, https://www.Pornhub.com/model/suga-daddy-zo (last visited Mar. 2021). See attached Exhibit 5 [AS REFERENCDED IN THE ORIGINAL COMPLAINT].
[70] *Id.*
[71] *Id.*

MindGeek approves them for distribution, collects the money paid by "fans", makes direct payments to this perpetrator, and shares in the profits.

**B.** Verified Model, Modelhub member, and sex tourist Randy Johnson advertises his videos as "massage videos of young amateur teens and milfs" where he records illegal message sessions that result in commercial sex acts with titles such as, "Oil Massage for tiny ebony teen then smash her hard", "Black Teen Massage ends in Reverse Cowgirl & Doggy", and "Hotel Thai Massage Girl Gets Destroyed by Tourist".[72] The production type is listed as homemade and the tags include "massage, hotel massage, [f**k] massage, exploited teens, and exploited teens asia." Because Randy is a verified model, Pornhub receives a percentage of any money he makes through Modelhub, including tips. Again, each video depicts different women from different countries, and it is clear in many of the videos that the women do not know they are being recorded, some of the titles include phrases like "secret filming". Their information is not being verified by MindGeek yet MindGeek shares the profits from these videos. His videos have 9.8 million views.

**C.** A missing 15-year-old-girl was found by her mother in 58 pornographic videos, many of which were on Pornhub and Modelhub.[73]

D. CVI was trafficked by a MindGeek Modelhub member and Content Partner.

E. Numerous lawsuits have been filed by individuals who were trafficked on the MindGeek Defendants' platforms during the same time period that CV1 was trafficked, including in the State of Alabama. For example, in *Jane Doe #1, et al., vs. MG Freesites, LTD, d/b/a "Pornhub", et al.*, Civil Action No. 7:21-cv-00220-LSC, N.D. Ala. July 23, 2021, the Plaintiffs detailed systemic trafficking and sexual exploitation of minor children in Alabama that was ultimately disseminated on the Defendants' platform(s).

---

[72] *See* Pornhub, https://www.pornhub.com/model/randy-johnson/videos (Last visited Mar. 2021), Attached as Exhibit 6.

[73] Pritha Paul, *15-year-old girl missing for a year spotted in 58 videos on adult websites, Periscope and Snapchat by mother,* MEAWW (Feb. 27, 2021), https://meaww.com/missing-teen-adult-video-Pornhub-Modelhub-snapchat-periscope (Last checked July 6, 2022).

MINDGEEK'S PROFIT MODEL

**111.** MindGeek's business model is tied to user clicks and views; the more user engagement, the higher the profits.

**112.** To draw in new users and maintain market share, MindGeek makes   most of its library fully available and free to view, even without creating an account. In this way, MindGeek will distribute content -- including child pornography -- to anyone with an internet connection.

**113.** To maximize content MindGeek allowed anyone to upload videos, even anonymously, with no age or consent verification. All that was needed was an email address to create an account, and a video could be uploaded and live within minutes. MindGeek formatters would modify titles and add keywords and tags to ensure videos incurred views but would take no measures to ensure those depicted in the videos had consented or were adults.

**114.** MindGeek also sells videos on a one-off or subscription basis.  Videos may be downloaded for a cost as well.  Under this model, MindGeek makes the sale for a fixed price for download, as well as any applicable subscription fees, then divides that revenue with users who have uploaded videos.  The commission is gauged by the length of time a video is viewed or number of times a video is downloaded.

**115.** MindGeek employees create content on Pornhub to increase and encourage visits to particular pornographic videos and images by developing an achievement system for milestones related to particular videos and views.  More views and longer views equal more money.

**116.** Traffic Junky is a web advertising and digital marketing company created, owned, and/or operated by MindGeek for use on Pornhub.  One of the revenue models for MindGeek is based on being able to sell ads to advertisers.

117.    Through Traffic Junky, MindGeek sells banner and sidebar advertisements, as well as advertisements that appear before and after videos. MindGeek placed these advertisements on videos featuring CSAM.[74]

118.    As noted above, MindGeek hires formatters who are instructed to label and tag videos and images for the purpose of viewing and categorizing content to increase search engine optimization and so that advertisers can reach users quickly. If users are frequently searching for a term, MindGeek will capitalize on it and produce or tag materials based on frequent search terms by the users.

119.    MindGeek edits advertisements placed on its website and TraffickJunky is the MindGeek department that facilitates "data driven decisions" about advertising content.  These ads frequently highlight terms such as "girls," "boys," "broken teens" and "twink," which are terms that are known and encouraged for use by MindGeek and are the same terms that promote the use and creation of child sexual abuse materials.  Further, it advises the most popular keywords to use, including "teen" as the second most searched term by millennials.[75]  Traffic Junky publicizes how it targets a younger population by reaching them Monday nights, not on the weekend when they are out with friends.

120.    MindGeek developed ads and affirmatively chose the characteristics and categories of content to determine what users would be targeted and where the ads would be directed.

121.    One of the MindGeek companies that collects subscriptions from premium users of MindGeek's websites (MG Billing Ltd) generated revenue of at least $1.3 billion between 2012

---

[74] *See,* https://financialservices.house.gov/uploadedfiles/hhrg-117-ba10-wstate-mickelwaitl-20210325.pdf (Last visited July 6, 2022).
[75] *See*, https://www.trafficjunky.com/blog/2016/09/16/want-to-target-millenials/ (Last visited July 6, 2022).

and 2018 and revenue for 2018 alone totaled at least $220.9 million – or a weekly average of at least $4.2 million.[76]

**122.**    With its Modelhub program, subscription revenue, premium content, data collection and advertising, MindGeek profited from images and videos of commercial sex acts, including the sexual abuse and rape of children, and by definition trafficking victims, who were under eighteen years of age. This profit-making activity included the rape of CV1.

**MINDGEEK'S DATA MINING AND OPTIMIZATION**

**123.**    MindGeek's billions of monthly views allow it to gather massive amounts of consumer data, and to use that data to grow, become more competitive, and help shape new content.[77]

**124.**    MindGeek uses "data-driven creativity" to produce, suggest, and promote content that is tailor-made for users according to what they have previously enjoyed,[78] including videos involving non-consensual actors, rape, and child pornography.

**125.**    According to press reports, MindGeek uses data mining to highlight new trends, compare viewing habits of users in different cities or regions, and to register what videos users are choosing, including which moments they pause at, which scenes they skip, and which scenes they rewind to and replay.[82] MindGeek even harvests data on and commercializes the clothes actors wear and the furniture in the videos.

---

[76] *See* Gordon Deegan, *Grant Thornton Resigns as Auditor to Firms Owned by Pornhub Operator,* Irish Times (February 9, 2021) https://www.irishtimes.com/business/economy/grant-thornton-resigns-as-auditor-to-firms-owned-by-Pornhub-operator-1.4480517#.YCMd5f48f6s.twitter (Last visited July 6, 2022).
[77] *See* Kal Raustiala & Christopher Jon Sprigman, *The Second Digital Disruption: Streaming and the Dawn of Data-Driven Creativity*, 94 N.Y.U. L. Rev. 1555, 1583 (2019), https://www.nyulawreview.org/wp-content/uploads/2019/12/NYULawReview-94-6-RaustialaSprigman.pdf (Last visited July 6, 2022).
[78] *See* Sam Harton, *The Porn Industry Leads Streaming Services In User Data Mining (UPDATED)*, My Tech Decisions (January 2, 2019), https://mytechdecisions.com/compliance/the-porn- industry-leads-streaming-services-in-user-data-mining/ (Last visited July 6, 2022).

126.    MindGeek harnesses the data it compiles and analyzes to write scripts and specify details for the content it creates directly. The level of detail and overall approach to MindGeek's content production illustrates the impact of MindGeek's analysis of user data on MindGeek's content creation process. MindGeek caters to fetishes and incorporates and highlights elements of the videos on its websites that data suggests are essential to success, including illegal elements such as rape, child sexual abuse, and other non-consensual activity.

127.    MindGeek's leadership has stressed that content choices -- including certain dialogue, sex acts, and particular positions and camera angles -- reflect the data mining of millions of views. This allows MindGeek to determine what variables produce the highest viewership, which is a way for MindGeek to capitalize on sharing profits from ads, downloads, and also to drive users toward purchasing premium subscriptions.

128.    In addition, MindGeek generates titles and tags for video and image uploads and reviewers/moderators at MindGeek also edit titles and tags associated with videos and images on its websites. Tags are keywords to be associated with a video and will be referenced when users search the websites' video collection.[79] In MindGeek's own words, "Tags help to drive search results."[80]

129.    MindGeek knows that there is a demand for CSAM on their sites and they cater to this demand. Many of the tags, categories, and search suggestions that have been created or edited by MindGeek facilitate users seeking easy access to child pornography, child sex trafficking, or any other form of child sexual abuse material, including that depicting CV1.

---

[79] Pornhub, *What are Tags,* Help Center, https://help.Pornhub.com/hc/en-us/articles/360044322674-What-are-tags- (last visited Mar. 20, 2021).
[80] *Pornhub Playbook*, *supra* note 24, at 11.

**130.** One such tag MindGeek used to classify pornographic content on its websites was "Teen." The suggested terms include "abused teen," "crying teen," "extra small petite teen," and "Middle School Girls."[81]

**131.** In 2018, the word "teen" was the seventh most searched term on all of Pornhub.[82]

**132.** Other eponymous search terms, including "rape," "preteen," "pedophilia", "underage rape," and "extra small teens," would call up videos depicting the same.[83]

**133.** The proliferation of these keywords and tags on the website ensures that when outside users Google these terms, Pornhub, or another MindGeek website, will be among the top results. This draws new users, even those searching the internet for illegal content, to MindGeek websites.

**134.** MindGeek's aggressive data collection and traffic analytics mean that MindGeek knows exactly what users are looking for (and what exists) on their sites and that this includes sex trafficking material and CSAM. For example, as the *New York Times* recently reported, as of December 4, 2020, a search for "girlunder18" led to more than 100,000 videos. And a search for "14yo" led to more than 100,000 videos and "13yo" led to approximately 155,000 videos.[84] MindGeek sought to capitalize on such traffic by allowing illegal search terms, creating suggested search terms, keywords, and tags.

---

[81] *See* https://financialservices.house.gov/uploadedfiles/hhrg-117-ba10-wstate-mickelwaitl-20210325.pdf (Last visited July 6, 2022).
[82] Pornhub, *2018 Year in* Review, Pornhub Insights (December 11, 2018), https://www.Pornhub.com/insights/2018-year-in-review#searches.
[83] Nicholas Kristof, *The Children of* Pornhub, N.Y. Times (Dec. 4, 2020),
https://www.nytimes.com/2020/12/04/opinion/sunday/pornhub-rape-trafficking.html (Last visited July 6, 2022).
[84] *Id.*

## MindGeek's Moderation Policies and Procedures

135.     Unlike other video websites like YouTube, MindGeek's websites *also include a download button* to allow for the transfer of images and videos, including child sexual abuse material, allowing an undisclosed number of child pornographers, child sex traffickers, and pedophiles permanent access to and control over the material.

136.     MindGeek maintains an offshore "moderation team" whose primary job is that of formatting content (internally they are referred to as formatters), but who are also tasked with reviewing uploaded videos to identify (but not necessarily reporting or blocking) anything "inappropriate," including, but not limited to, child pornography videos.

137.     There are essentially three categories of "inappropriate" videos that these individuals are tasked with identifying: (1) underage; (2) slightly underage and (3) non-minor inappropriate videos, such as bestiality videos or videos where someone is being murdered.

138.     Workers at MindGeek report categorizing and tagging sex acts and fetishes, as well as viewing "suspicious" content, "from puppies being kicked to death, to child abuse, rape and incest." [85]

139.     MindGeek's philosophy is that if videos appeared to be "professionally made," moderators were to assume that they were not child pornography and should not be flagged as inappropriate.

140.     Moderators were instructed to assume MindGeek's business partners, Channel Partners and Modelhub members, were abiding by the rules and to upload their content with little scrutiny.

---

[85] Daily Mail, *Our job was to find weird excuses not to remove them': Pornhub moderators, who watched 1,200 videos A DAY, reveal lenient guidelines at the site being sued for $80m for 'profiting from sex trafficking*, (Dec. 17, 2020, 5:29 PM), https://www.dailymail.co.uk/news/article-9065059/Ex-Pornhub-moderators-reveal-life-inside-explicit-video-site-sued-80m.html (Last visited July 6, 2022).

**141.** Even where videos were acknowledged as CSAM-- or carrying illegitimate search terms -- MindGeek has sometimes just retitled these videos and has failed to remove them from being viewed or downloaded. [86]

**142.** Despite the incredible volume of material being posted, MindGeek employs around ten people on this team at any given time throughout the day to review all MindGeek tube sites, including YouPorn, RedTube, XTube, Tube8, and Pornhub.  Upon information and belief, these people have no prior training, medical or otherwise, to identify whether someone depicted in a pornographic video is a child.

**143.** The ten individuals on the "moderation/formatting team" were each tasked by MindGeek to review approximately 800-900 pornographic videos per 8-hour shift, or about 100 videos per hour.  According to Pornhub, there are approximately 18,000 videos uploaded daily, with an average length of approximately 11 minutes per video. [87]  Hence, each moderator is tasked with reviewing approximately 1,100 minutes of video *each hour*.  This is an impossible task, and MindGeek knows that. [88]

**144.** To compensate for and accomplish the impossible task, moderators/formatters fast-forward and skip through videos, often with the sound turned down.  The problem is not resources: MindGeek's annual revenues are at least $500 million, and it could certainly hire and train more true moderators.

---

[86] Nicholas Kristof, *The Children of* Pornhub, N.Y. Times (Dec. 4, 2020),
https://www.nytimes.com/2020/12/04/opinion/sunday/pornhub-rape-trafficking.html (Last visited July 6, 2022).
[87] *See* Pornhub, *supra* note 12.
[88] *See* parlvu.parl.gc.ca/Harmony/en/PowerBrowser/PowerBrowserV2/20210205/-
1/34697?Language=English&Stream=Video at 14:01 (Last visited on July 6, 2022).

145.    There is a yearly bonus system, based on the number of videos approved. This results in individuals fast-forwarding to the end of videos (or not reviewing them at all) and approving them, even if they depict sex trafficking of children.

146.    The impossible conditions also result in low morale for the individuals tasked with reviewing videos.  These moderators/formatters watch hours upon hours of demoralizing and disturbing videos, including child pornography.

147.    When minor victims of sex trafficking and their representatives have contacted MindGeek to remove videos of them from its websites, MindGeek has refused to do so.

148.    In some cases, MindGeek moderators/formatters even looked at video comments, deleted those noting a video constituted child pornography or otherwise should be removed from the system, and left the video up.

149.    The MindGeek moderators/formatters are discouraged from removing illegal content for particularly profitable users.  Generally, when an uploader has a history of highly viewed content, the employees are only permitted to send warning letters about illegal or inappropriate content.

150.    Worse, not all of the moderators/formatters even have the authority to remove videos. When child pornography is reported, the video could only be removed by the "team leader."  There is an approximate backlog of five months between when a user reports a video and a "team leader" reviews it to determine whether to remove it.  Thus, such videos would sit on MindGeek's platform(s) for five months, available for download and redistribution.

151.    MindGeek was not registered with NCMEC to report as an electronic service provider until 2020.[89]  Thereafter, MindGeek, across all of its websites, submitted only 4,171 unique reports to NCEMC in 2020, which clearly underreported coming from a pornographic site when compared to a non- pornographic site like Facebook, which reported 20 Million CSAM instances to NCME in 2020.

152.    MindGeek's failure to report to NCMEC has another consequence: even when they actually ban users for child pornography or rape, that user's data (and videos) are banned for only 90 days (unless MindGeek made a formal law enforcement report and was obligated to preserve that data).  After 90 days, all data associated with the banned material and user is deleted leaving no ability for MindGeek to block the user from creating a new account and posting the same video again after 90 days.[90]

153.    MindGeek's policies, or lack thereof, incentivize its employees not to remove child pornography and other inappropriate content, and sometimes prevent them from doing so altogether.

154.    MindGeek's policies also allow and incentivize users to view, post, obtain, and trade illegal content in the first place.

155.    MindGeek permits and encourages the use of VPN connections (less secure and less traceable connection) to create accounts, browse and process videos, including those containing illegal content, so as to keep the users' location and true identity private and anonymous.

---

[89] For the year 2020, MindGeek made only 13,229 reports of CSAM to NCMEC and then clarified in its 2020 "Transparency Report" that many were duplicates.  Pornhub, *Transparency Report*, Pornhub Help Center, help.pornhub.com/hc/en-us/articles/1260803955549- Transparency-Report, (last visited Mar. 20, 2021).
[90]*See generally*, https://www.ourcommons.ca/Content/Committee/432/ETHI/Brief/BR11079307/br-external/MindGeek-e.pdf (Last visited, July 6, 2022).

**156.** MindGeek profits from encouraging VPN use, and in May 2018 launched its own VPN service. VPN not only disguises who is accessing the site, but permits banned users to re-enter the site and reuse the banned images or videos as well as the associated comments, tags, and keywords, amongst other things.

**157.** MindGeek has both free and paid for VPN options which permits MindGeek to obtain all browsing data, including searches for banned terms, keywords, taglines, and associated comments. This data creates another avenue for MindGeek to capitalize and share in profits from selling the data and prime advertising spots.

**158.** As set forth in more detail above, MindGeek has signaled in a number of other ways to users, including sex traffickers, that illegal content will be tolerated and enabled on its sites, including: (1) lack of meaningful verification of identity, including user and video performer ages, (2) no attempt to obtain consent from all performers in the video, (3) no prohibition on user accounts having "managers," (4) permitting downloads (inviting re-uploads of banned content), (5) permitting completely anonymous uploads, and (6) lack of other available safeguard processes.

**159.** MindGeek apparently stores a copy of all content on its servers, even CSAM, regardless of whether the content has been removed from public view.[91]

**160.** Even when content has been removed at the request of NCMEC, MindGeek has continued to profit from this material by disabling the video or image but keeping the link to the video live with all of the associated metadata, keywords, comments, and tags. This allows the link to still appear in the search engine results for someone searching for illegal material. The user is then led to Pornhub with the message that the video was removed, but there is also a message created by MindGeek suggesting "related videos" to further engage the viewer on their site.

---

[91] David Tassillo, *Ethics Comm. Hearing No. 19,* at 01:43:32, Rev Services, (transcript available at https://www.ourcommons.ca/DocumentViewer/en/43-2/ETHI/meeting-19/evidence) (Last visited July 5, 2022).

Additionally, the video continues to feed SEO, as its tags, keywords, and title are still live on the site and continue to garner traffic.

161.    In one instance, a prepubescent victim was anally raped in a video featured on Pornhub. The video was uploaded to the site three times. There is documented evidence the video was reported to Pornhub, but Pornhub did not act until NCMEC issued a take-down request. Even after Pornhub was forced to remove the video, it left the link, title, and tags on the site so they could continue to drive traffic. [92]



---

162.    MindGeek has hosted and is in possession of a surfeit of additional illegal content, including rape videos, child sexual abuse materials (CSAM),[93] videos produced through sex trafficking,[94] and nonconsensually shared pornography.[95]

163.    At least some of this content violates § 1591 and has been reported to MindGeek as such. That is, any content involving minors is per se sex trafficking, and any content produced through force, fraud, or coercion is also sex trafficking.

164.    Because MindGeek has monetized the pornographic content (including those involving minors who are necessarily trafficking victims) on its site through Modelhub revenue, Modelhub tips, advertisements, data mining, and premium subscriptions,[96] it is and has been facilitating and profiting from commercial sex acts.

## MINDGEEK'S CHILD TRAFFICKING VENTURE
## AND THE EGREGIOUS VICTIMIZATION OF PLAINTIFF CV1

165.    Defendant Franklin was an Alabama resident residing at 348 Gravel Hill Road, Greenville, Butler County, Alabama 36037.

166.    Upon information and belief, from approximately July 2018 to October 2018, Franklin lived with CVI Mother and her minor children. During this time, Defendant Franklin molested and raped at least two minor children. One of those children was CV1, a 12-year-old

---

[93] *See* Scott McDonald, *Florida Man Arrested After 58 Porn Videos, Photos Link Him To Missing Underage Teen Girl*, Newsweek (Oct. 23, 2019, 11:46 PM), https://www.newsweek.com/florida-man-arrested-after-58-porn-videos-photos-link-him-missing-underage-teen-girl-1467413 (Last visited July 5, 2022).
[94] *See* Samantha Cole, *Girls Do Porn Employees Charged With Sex Trafficking, Potentially Face Life in Prison*, VICE (Oct. 11, 2019), https://www.vice.com/en/article/qvgxvw/girls-do-porn-employees-charged-with-sex-trafficking-potentially-face-life-in-prison (Last visited July 5, 2022).
[95] *See* Harriert Grant, *World's biggest porn site under fire over rape and abuse videos*, The Guardian (Mar. 9, 2020, 3:00 PM), https://www.theguardian.com/global-development/2020/mar/09/worlds-biggest-porn-site-under-fire-over-videos-pornhub (Last visited July 5, 2022).
[96] Modelhub, *surpa* note 59.

child at the time of the molestation. Franklin overpowered them, and in some instances, drugged them in order to victimize them while recording his acts of sexual violence.

167.    Before the rape of Plaintiff CV1, the MindGeek Defendants maintained their complex corporate structure of companies, and created a system for, a safe haven for, assistance to, professionals to help with, and the network of business relationships with, child molesters to publish sexually explicit material of minor children for financial benefit.

168.    At least by May 2019, Franklin entered into an agreement and/or joint venture with the MindGeek Defendants as an "actor" on Pornhub and identified his place of residence in the agreement as 348 Gravel Hill Road Greenville, Alabama. His Pornhub username was entitled "uRockMyCock" and his Pornhub stage name was "Cooter Shooter."

169.    On September 6, 2019, the Alabama Law Enforcement Agency ("ALEA") received 67 CyberTips from the National Center for Missing and Exploited Children ("NCMEC") associated with the email address rockysdream18@gmail.com, which was being used for the storage and dissemination of sexually explicit images of minor children.

170.    The investigation revealed that Franklin was the holder of the IP address linked to this and other email addresses, and that he was residing at 349 Gravel Hill Road, Greenville, Alabama.

171.    On October 17, 2019, a search warrant was executed at Franklin's residence, where numerous electronic devices were recovered. Franklin was thereafter detained and transported to the Butler County, Alabama jail.

172.    Examination of Franklin's devices revealed disturbing images of Franklin sexually assaulting CV1 (a 12-year-old-boy) and another minor child related to CV1, as well as other unidentified minor children.

173.   The investigation further revealed that Franklin's professional Pornhub account was set up at least by May 30, 2019, with the account's residence, username and stage name as identified above.

174.   Franklin's web history revealed that Franklin had researched and discovered that Pornhub pays "actors" for content views. According to the website, "Viewshare" is a program allowing Premium members to receive a commission based on the number of views an "Actor's" uploaded content received.

175.   Analysis of Franklin's web history revealed 121 entries with open links to Pornhub.com, where he provided, and the MindGeek Defendants procured for sale, downloadable videos depicting Franklin's sexually explicit victimization of CV1.

176.   The videos depicting CV1 were offered for sale on the MindGeek Defendants' platform for prices ranging between $5 to $20 per download.

177.   In total, videos of CV1's molestation generated an astonishing 188,000 video views with over 1,100 subscribers on Pornhub. One video, entitled "My favorite nephew," generated over 50,000 views by itself. Another video, entitled "Opening Up Stepnephew's Hole", depicting CV1, was uploaded to Pornhub, the MindGeek Defendants' platform, on October 11, 2019 and offered for sale for $15.

178.   Franklin, in the videos of his molestation of CV1, used disturbing titles that clearly suggested the child depicted was a minor, including but not limited to:

      A.  "[Had sex with] my StepNephew", (May 30, 2019).
      B.  "Reentry", (June 6, 2019);
      C.  "Teasing my little nephew", (June 6, 2019);
      D.  "Taking Teen Virginity", (June 7, 2019);
      E.  "Teen gut b*****", (June 27, 2019);
      F.  "Another Teen Virgin", (June 27, 2019);
      G.  "Nephew's perfect a**", (July 11, 2019);
      H.  "A Uncle's Secret", (July 25, 2019);

I.   "My favorite nephew", (July 25, 2019);

J.   "S****** stepuncle's [penis]", (July 31, 2019);

K.   "Young A** is Best", (August 8, 2019);

L.   "BBC thug breeds me", (August 8, 2019);

M.   "Them DL Bros", (August 15, 2019);

N.   "My sweet little nephew", (August 15, 2019);

O.   "Stupid Hoe", (August 22, 2019);

P.   "Perv Teen Takes Uncle's L***", (October 7, 2019);

Q.   "I turn myself on", (October 8, 2019);

R.   "Opening Up Stepnephew's H*** (October 11, 2019);

S.   "Now Serving #248", (October 11, 2019;

T.   "Juicy Booty Teenager", (October 11, 2019);

U.   "Munching Down", (October 11, 2019);

V.   "D***** Down", (October 11, 2019);

W.   "Teenage Stepnephew [performs oral sex] like a Pro", (October 11, 2019);

179.   In posting the videos to Pornhub, Franklin followed the guidelines and suggestions of the MindGeek Defendants in the creation of tagged search terms, including references to "teens".

180.   In posting the videos to Pornhub, one of the MindGeek Defendants' platforms, Franklin utilized his status as one of the MindGeek Defendants' actors, and also used his Pornhub stage name.

181.   The MindGeek Defendants provided the same assistance, platform, content mandates, and edits as described in the preceding sections of these Facts to Defendant Franklin to ensure these illegal videos generated the maximum amount of views and drove the maximum volume of traffic for the mutual benefit of the Defendants and their unlawful scheme.

182.   Up until law enforcement independently identified Defendant Franklin, over the course of the relationship between these Defendants, the MindGeek Defendants never informed the authorities about the identity of Defendant Franklin, the fact he posed child sexual violence, or the fact that child sexual violence was being utilized on their platforms for profit to their mutual benefit.

183.     Upon information and belief, through their contractual relationship, joint venture, conspiracy, scheme and/or racketeering conduct, the Defendants profited from the exploitation of sexual violence and human trafficking of Plaintiff CV1, in that they received something of value in return for their acts or omissions in exploiting sexual violence or trafficking of Plaintiff CV1.

184.     The videos posted to Pornhub by Franklin contained ***obvious*** sexually explicit depictions of a minor child, including disturbing acts of molestation.  Indeed, at all material times, the photographs, videos, and/or depictions that the MindGeek Defendants offered for sale on their platform in conjunction with their venture with Franklin were those of sexual victimization of minor children.

185.     These videos drove MindGeek traffic in the tens of thousands, some of which remained up for sale on Pornhub's platforms for almost seven (7) months, where users could purchase the videos and then download them. Thereafter, the videos depicting sexual violence of CV1 were free to be circulated on the internet into perpetuity.

186.     On or about November 18, 2019, the MIndGeek Defendants were warned by law enforcement to take the material down because it involved a suspect sexually assaulting minor children.

187.     On or about November 26, 2019, law enforcement again inquired about when the material would be removed, as it was still up on the MindGeek Defendants' platform notwithstanding law enforcement's previous request.

188.     Astonishingly, on or about December 12, 2019, law enforcement again requested the material be removed, as it was still up on the MindGeek Defendants' platform. Upon information and belief, the MindGeek Defendants would not remove the material until at least by December 13, 2019.

189.     At no time did the MindGeek Defendants attempt to verify CV1's identity or age, inquire about their status as minor children, victims of sex trafficking, or otherwise use their platform to root out the trafficking of their images. Instead, the MindGeek Defendants continued to disseminate these images around the world for profit even after law enforcement informed the MindGeek Defendants the images contained child pornography.

190.     On May 4, 2020 Defendant Franklin was arrested for the sexual exploitation of a child, advertising child pornography, and the distribution of child pornography. Ultimately, Mr. Franklin pled guilty to charges stemming from this incident, and he is currently serving a forty (40) year prison sentence.

191.     The MindGeek Defendants, whether individually, concurrently, and/or through their joint venture, conspiracy, and/or enterprise with child traffickers, including Defendant Franklin, sold, downloaded, possessed, viewed, advertised for sale, disseminated, benefited from, and/or otherwise monetized the sexual exploitation and trafficking of CV1.

192.     As a consequence of the Defendants' actions and/or inactions, and through the MindGeek Defedants' platform(s), horrific images and videos of CV1 depicting child molestation, rape, and sodomy, have been produced and distributed across the world.

193.     As a consequence of the Defendants' actions and/or inactions as described in detail above, and through the MindGeek platform(s), these horrific images and videos of CV1 will now be a permanent fixture of the internet, as they were downloaded by subscribing viewers from the MindGeek Defendants' platform(s), and could at any time resurface on the MindGeek Defendants' platform(s).

194.     As a consequence of their actions and/or inactions as described in detail above, the MindGeek Defendants have created an environment that perpetuates the world-wide transfer and

monetization of child pornography on their platform(s), thereby encouraging the sexual exploitation of minor children by people such as Franklin for profit.

195.    As a consequence of the Defendants' actions and/or inactions as described in detail above, and through the MindGeek Defendants' platforms, the Defendants have improperly (and illegally) appropriated the likeness of CV1 for monetary gain, of which has caused CV1 to be economically damaged.

196.    For all of the reasons stated herein, CV1 has suffered incomprehensible past and present physical, emotional, and mental trauma.

## CAUSES OF ACTION

### COUNT ONE

#### RECEIPT AND DISTRIBUTION OF CHILD PORNOGRAPHY
#### 18 U.S.C. § 2252 and 2255

#### (Against MindGeek Defendants)

197.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

198.    At the time of the subject wrongful conduct, which included the posting of sexual violence of CV1 on the MindGeek Defendants' platform(s), CV1 was a minor child.

199.    The MindGeek Defendants maintain websites and a large multi-billion dollar pornographic business that affects interstate commerce and specifically targets United States citizens across the nation, including in the State of Alabama. Moreover, the MindGeek Defendants contract with participating individuals who upload pornographic material – including in this case, sexually violent pornographic material involving children, to drive viewership, traffic to the MindGeek Defendants' premium sites, and advertising revenue. In return, the MindGeek

Defendants transact business with these participating individuals across the world, in the United States, and here in Alabama.

200. As part of their multi-billion dollar pornographic business, the MindGeek Defendants recruit, entice, advertise to, or solicit persons to conduct business for or in the exploitation of sexual violence with minor children.

201. Furthermore, the MindGeek Defendants worked closely with; mandated actions to; provided guidelines for; contributed to; and otherwise assisted "actors" like Franklin in the preparation, placement, advertisement of, and monetization of sexually explicit images of CV1.

202. Moreover, as part of their business, the MindGeek Defendants entered into a venture with participating individuals, including, for example, Franklin, to solicit, obtain, maintain, exploit, disseminate, or otherwise profit from sexually violent pornographic material of minor children.

203. At least by May 30, 2019, the MindGeek Defendants entered into an explicit agreement with Franklin for the sharing of benefits between themselves from the exploitation of CV1.

204. On or about May 30, 2019, and pursuant to the venture entered between Franklin and the MindGeek Defendants, numerous images, videos and/or depictions of Franklin's sexually violent acts of CV1, a minor child, were uploaded and disseminated to thousands (if not millions) of viewers using the MindGeek Defendants' platform(s), assistance, and contribution(s).

205. The Defendants never obtained the consent of CV1 for the posting of these images, videos and/or depictions (they could not), nor did the MindGeek Defendants ever investigate and/or seek to determine the age and identity of CV1.

206.     The images, videos and/or depictions of CV1 remained on the MindGeek Defendants' website for many months, garnering over 180,000 views, as well as downloads, of which conferred a substantial financial benefit to the MindGeek Defendants in multiple ways, including advertising exposure and the driving of traffic for advertising revenue, fee-based subscription services, and the use and selling of user data.

207.     Over the course of their venture with Franklin, as well as the posting and exploitation of sexual violence as to CV1, the MindGeek Defendants knowingly assisted, supported, and/or facilitated numerous violations of federal law related to child sex trafficking, sexual violence as to minors, and the exploitation of sexual violence of children.

208.     Over the course of their venture with Franklin, the MindGeek Defendants knowingly transported, shipped, disseminated, produced, used, possessed, sold, and/or depicted sexually explicit conduct involving a minor child in or affecting interstate commerce, or otherwise engaged in certain activities relating to material involving the sexual exploitation of minors.  18 U.S.C. § 2252.

209.     Over the course of their venture with Franklin, the MindGeek Defendants, some of which may have been from outside the United States, knowingly received, transported, shipped, distributed, sold, or possessed with the intent to transport, ship, sell, or distribute visual depictions of a minor child engaged in sexually explicit conduct intending that the visual depiction would be imported into the United States. 18 U.S.C. § 2260(b).

210.     The MindGeek Defendants knowingly persuaded, induced, enticed, or coerced Franklin to engage in sexual contact with a minor child, or to otherwise conduct sexual activity of which any person could be charged with a criminal offense. 18 U.S.C. § 2422.

211.     The MindGeek Defendants, whether individually and/or collectively in concert with Franklin, conspired to procure, and then publish and/or disseminate sexually explicit material of a minor child within interstate commercial for financial gain.

212.     CV1 was a victim of the Defendants' wrongful conduct as referenced herein, and is entitled to all damages available to him pursuant to 18 U.S.C. § 2255, including but not limited to: all actual damages sustained, the full value of the loss, liquidated damages, the cost of this action, attorney's fees, litigation costs, punitive damages, civil penalties as determined by the Court, and all other preliminary and equitable relief that the Court deems appropriate and just.

### COUNT TWO

### BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT

### 18 U.S.C. §§ 1591, 1595

### (As to all Defendants)

213.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

214.     Defendants' conduct was in, or affected, interstate and/or foreign commerce.

215.     Defendants knowingly benefited from participation in what they knew or should have known was a sex trafficking venture, in violation of 18 U.S.C. §§ 1591(a)(2) and 1595(a).

216.     The MindGeek Defendants monetized content on their platforms through user-focused products and services, such as advertisements and data collection as well as share profits with and make direct payments to child traffickers via their Modelhub program, Content Partners, and otherwise.

217.     The MindGeek Defendants' ability to monetize their platforms is directly related to the number of users who visit and view content on their platforms. The number of users using the

MindGeek Defendants' platforms are inherently valuable to the MindGeek Defendants, and directly affects their ability to draw revenue from their platforms and share it with traffickers.

218.    Defendants knowingly benefited from, and/or received something of value for their participation in the venture, in which Defendants knew, should have known, or were in reckless disregard of the fact that the Plaintiffs were engaged in commercial sex acts while under the age of eighteen.

219.    The MindGeek Defendants' employees and agents had actual knowledge that they were facilitating and participating in a scheme to profit from the commercial sex acts of minor children.

220.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1591.

221.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595.

222.    As a proximate result of the Defendants' actions and/or inactions, the Plaintiff suffered traumatic, repeated, and now life-altering sexual violence; personal and physical injuries; past, present and future pain and suffering; past, present and future medical expenses; severe and permanent mental anguish, disability and emotional distress; loss of the capacity for the enjoyment of life; incidental expenses; consequential damages to be proven at trial; the full value of the loss as determined by the court; civil and criminal penalties; and all other damages related to the Defendants' conduct as determined by the Court.

223.    The Plaintiff is entitled to bring this suit and seeks all damages to which he may be entitled as a result of the Defendants' conduct and corresponding horrific injuries sustained.

**COUNT THREE**

**HUMAN TRAFFICKING**

**REPRESENTATIVES JACK WILLIAMS AND MERIKA COLEMAN ACT, ALA. CODE § 13A-6-150**

**(As to All Defendants)**

224.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

225.    At all materials times referenced herein, Plaintiff CV1 was a minor child.

226.    At all materials times, Plaintiff CV1 was a victim of coercion, deception, sexually explicit performances, sexual conduct, sexual servitude, and was a trafficking victim, as defined in Ala. Code § 13A-6-151 in the Jack Williams and Merika Coleman Act.

227.    Furthermore, the Defendants engaged in a pattern of coercion, deception, labor servitude, sexual conduct, sexual servitude and the trafficking of Plaintiff CV1, as defined in Ala. Code § 13A-6-151 in the Jack Williams and Merika Coleman Act.

228.    The Defendants, through their independent, joint efforts, and/or combined and concurring conduct, caused the Plaintiff to suffer mental suffering, physical injury, sexual conduct, sexual servitude, and/or trafficking, as defined in Ala. Code § 13A-6-151 in the Jack Williams and Merika Coleman Act.

229.    As part of their independent, joint effort, and/or combined and concurring conduct, Plaintiff CV1 performed sex acts of which the Defendants either gave value, promised the given of value, or received, directly or indirectly between themselves, value for the sexual victimization of Plaintiff CV1 where the Defendants meet the definition of engaging in commercial sex acts of a minor child.

230.    The Defendants, whether directly or indirectly, knowingly benefited, financially or by receiving anything of value, for their participation in a venture or engagement for the purpose of sexual servitude or labor servitude of Plaintiff CV1.

231.    Moreover, the Defendants knowingly recruited, enticed, solicited, induced, restrained, subjected, or obtained by any means Plaintiff CV1 for the purpose of labor servitude or sexual servitude as defined in Ala. Code § 13A-6-151 in the Jack Williams and Merika Coleman Act.

232.    At all material times referenced herein, the MindGeek Defendants engaged in human trafficking acts or omissions, through their agents and/or their corporate entities, while acting in the scope of their and/or their agents and/or their corporate entities' scope of office, employment and/or on behalf of their and/or their corporate entities.

233.    At all material times referenced herein, the MindGeek Defendants engaged in human trafficking acts or omissions that were either authorized, requested, commanded, performed, or of which were within the scope of their and/or their agents' and/or corporate entities' scope of employment on behalf of the MindGeek Defendants, or which constituted a pattern of conduct that an agent of the MindGeek Defendants knew or should have known was occurring.

234.    At all material times referenced herein, the Defendants, whether independently, collectively, through their joint venture, and/or through their combined and concurring acts, obstructed, attempted to obstruct, and/or interfered with or prevented the enforcement of human trafficking laws of the State of Alabama, including the Jack Williams and Merika Coleman Act.

235.    As a consequence of the Defendants' actions and/or omissions, the Defendants have each violated the Jack Williams and Merika Coleman Act, their conduct was willful and malicious, and they are guilty and liable for human trafficking acts prohibited by the Act.

236.     The Defendants are therefore liable for all of the violations and penalties as contemplated in the Jack Williams and Merika Coleman Act, including civil penalties, actual damages, compensatory damages, punitive damages, injunctive relief, attorney's fees, costs, treble damages, any and all remedies under federal law or the laws of Alabama, or any further relief the Court deems appropriate and just.

## COUNT FOUR

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)

### (As to the MindGeek Defendants)

237.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein. The MindGeek Defendants knowingly carried out, or attempted to carry out, a scheme to create and profit from a market for child pornography by knowingly conducting or participating in the conduct of the Tubesite Enterprise and the Child Exploitation Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(A),(B),(C) and (D), and that used the mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

238.     The MindGeek Defendants' acts as referenced above concern acts involving violations of state and federal law, in that they involve obscene matter; slavery, and trafficking of persons; racketeering activities; monetary transactions in property derived from specified unlawful activity; sexual exploitation of children; acts indictable under the Currency and Foreign Transactions Reporting Act; as well as other indictable acts pursuant to Section 233b(g)(5)(B).

239.     The MindGeek Defendants entered into two distinct enterprises. First, the Defendants, amongst themselves, entered into an unlawful enterprise (Tubesite Enterprise) to leverage their respective business interests, internet framework, websites, and/or marketing

prowess to identify, target, solicit, encourage and/or obtain individuals willing to procure sexually explicit images, depictions, and/or videos which could then be exploited and/or marketed for profit on the MindGeek Defendants' platforms, whether through the generation of advertising revenue, driving of traffic to the MindGeek Defendants' pay sites, and/or to otherwise grow the viewership traffic of the MindGeek Defendants' businesses. This Tubesite Enterprise included the partnership, association, association, or group of individuals associated in fact, between the MindGeek Defendants and perpetrators like Franklin for financial gain to them both.

240.    Moreover, the MindGeek Defendants further entered into a criminal enterprise with Franklin (Child Exploitation Enterprise) to illegally obtain, possess, and then to exploit for profit, the images, depictions, and videos of sexually explicit acts on minor children. This Child Exploitation Enterprise included the partnership, association, or group of individuals associated in fact, between the MindGeek Defendants and Defendant Franklin for financial gain to them both.

241.    The MindGeek Defendants, as part of either and/or both of their enterprises, and in collaboration with Defendant Franklin, committed, conspired to commit, and aided and abetted in the commission of a pattern of racketeering activity (two (2) or more predicate acts) within the time period contemplated by the statute, including but not limited to:

- Possession of obscene matter of a minor child, Ala. Code § 13A-12-192(b);

- Possession of obscene matter of a minor child with the intent to distribute, Ala. Code § 13A-12-192(a);

- The film, print, recording, photography, or otherwise production of obscene matter containing a visual reproduction sexually explicit matter of a minor child, Ala. Code. § 13A-12-197;

- The possession and dissemination of child pornography by any means, including visual depictions of children engaged in sexual acts displayed on computers, computer diskettes, and the Internet, Ala. Code. 13A-12-192;

- The rape of a minor child, Ala. Code. § 13A-6-61, (a)(1).

- The sodomy of a minor child, Ala. Code. § 13A-6-63(a);

- The failure to report child abuse or neglect, C.B. v. Bobo, 659 So. 2d 98, 102 (Ala. 1995);

- The sexual exploitation of children, 18 U.S. § 2251;

- The transport, shipment, dissemination, production, use, possession, sale, and/or depiction of sexually explicit conduct involving a minor child in or affecting interstate commerce, or otherwise engaged in certain activities relating to material involving the sexual exploitation of minors, 18 U.S.C. § 2252.

- The production, distribution, receipt or possession with the intent to distribute, of a visual depiction of any kind that depicts a minor engaging in sexually explicit conduct, 18 U.S. § 1466A;

- Mail Fraud, by sending or receiving, or by causing to be sent and received, materials via U.S. mail or commercial interstate carriers for the purpose of executing an unlawful scheme to procure, possess, market, drive internet traffic, and/or profit from sexually explicit images of minor children, 18 U.S.C. § 1341;

- Wire Fraud, by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to procure, possess, market, drive internet traffic, and/or profit from sexually explicit images of minor children, 18 U.S.C. § 1343.

242. The MindGeek Defendants' actions in furtherance of this pattern of racketeering include, but are not limited to:

- targeting, identification, solicitation, and/or encouragement of individuals to possess, obtain, and/or provide sexually explicit images of minor children;

- the possession and dissemination of sexually explicit images of minor children;

- the transaction of business based on the possession and dissemination of sexually explicit images of minor children;

- the use of enterprise infrastructure, property, and/or business interests to procure, possess, market, drive internet traffic, and/or profit from sexually explicit images of minor children;

- the assistance, transaction of business with, and/or providing of business infrastructure, property, and/or access to a child molesting perpetrators

(Defendant Franklin) so said person can publish and disseminate sexually explicit images of minor children;

- the failure to confirm the ages of individuals before publishing sexually explicit materials of those individuals, who appear to clearly be children;

- the concealment from law enforcement of criminal acts, financial records, and/or other information concerning the enterprise and its involvement in sexually explicit material, so that such information could continue generating revenue, internet traffic, advertising revenue, and/or continued financial benefit;

- payments and/or conveyance of financial benefits, notoriety, exposure, and/or use of the MindGeek Defendants' infrastructure, made to individuals (including Defendant Franklin) for their uploading, posting, and procurement of explicit material of minor children;
- multiple, separate uploads of images, videos and/or explicit material of minor children;

- the continued production and dissemination of explicit material of minor children notwithstanding external warnings that such material involved minor children;

- the understaffing of resources which would otherwise be designed to discover and/or remove sexually explicit material of minor children;

- mail and wire transmissions in furtherance of the MindGeek Defendants' scheme and common course of conduct to locate, procure, possess, disseminate, and/or conceal their possession / involvement with sexually explicit material of minor children;

- engaging in any activities that meet the definition of "Prohibited Activities" pursuant to § 1962 of the Racketeer Influenced and Corrupt Organizations Act.

243.    The MindGeek Defendants' multiple acts of racketeering activity were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the MindGeek Defendants' actions, inactions, regular use of facilities, services, internet sites, distribution channels, and employees of the above-referenced enterprises.

244.     The MindGeek Defendants used, directed the use of, and caused to be used mail and wire communications in service of their scheme to carry out their unlawful goal of locating, procuring, possessing, and then distributing for profit sexually explicit depictions of minor children.

245.     The MindGeek Defendants, in conjunction with Defendant Franklin, committed crimes that are chargeable by indictment under the laws of Alabama and the United States. Many of these crimes are felonies that carry serious jail sentences and fines.

246.     By engaging in all of these acts, the MindGeek Defendants engaged in a scheme and unlawful course of conduct constituting a pattern of racketeering activity.

247.     It was foreseeable to the MindGeek Defendants that engaging in this illegal behavior would result in the victimization of minor children, and the possession, publication, and serious harm to the minor child in this case.

248.     At all material times, the victim of the Defendants' direct or indirect actions and/or inactions, in furtherance of the MindGeek Defendants' schemes, was a minor child.

249.     The last racketeering incident occurred within the time period as proscribed by the laws of the United States and the State of Alabama, for this lawsuit for RICO damages to be proper.

250.     The MindGeek Defendants' violations of law and their pattern of racketeering activity directly and proximately caused the Plaintiff's injuries.

251.     The Plaintiff's injuries were, and are being, proximately caused by the MindGeek Defendants' racketeering activities. But for the MindGeek Defendants' conduct, the Plaintiff would not have been the victim of a horrific rape, and the public dissemination of all explicit materials flowing from such a horrible event. Moreover, but for the MindGeek Defendants'

conduct, the Plaintiff would not have suffered the life-altering physical, emotional, mental and economic harm that he now suffers from and will continue to suffer from.

252.    The Plaintiff seeks all legal relief as allowed by law, including actual damages, treble damages, equitable relief, injunctive relief, the costs to bring this action, attorneys fees, litigation costs, forfeiture as deemed proper by the Court, pre and post-judgment interest, and any and all further relief the Court deems appropriate and just.

## COUNT FIVE

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) - CONSPIRACY

### (As to MindGeek Defendants)

253.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

254.    The Plaintiff brings this claim against all of the MindGeek Defendants. At all relevant times, the MindGeek Defendants were associated with at least two illegal enterprises, and agreed and conspired to violate one or more of the substantive sections of the Federal Racketeer Influenced and Corrupt Organizations Acts.

255.    The MindGeek Defendants conspired to violate the requisite Federal Racketeer Influenced and Corrupt Organizations Acts, as alleged more fully in Count II above, by conducting the affairs of the Enterprises through a pattern of racketeering activity.

256.    The Defendants' violations of law and their pattern of racketeering activity directly and proximately caused the Plaintiff's injuries.

257.    The Plaintiff's injuries were, and are being, proximately caused by the Defendants' racketeering activities. But for the Defendants' conduct, the Plaintiff would not have been the victim of a horrific rape, and the public dissemination of all explicit materials flowing from such

a horrible event. Moreover, but for the Defendants' conduct, the Plaintiff would not have suffered the life-altering physical, emotional, mental and economic harm that he now suffers from and will continue to suffer from.

258.    The Plaintiff seeks all legal relief as allowed by law, including actual damages, treble damages, equitable relief, injunctive relief, the costs to bring this action, attorneys fees, litigation costs, forfeiture as deemed proper by the Court, pre and post-judgment interest, and any and all further relief the Court deems appropriate and just.

## COUNT SIX

### PUBLIC NUISANCE

### (As to the MindGeek Defendants)

259.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

260.    A nuisance is defined as "anything that works hurt, inconvenience, or damage to another." Ala. Code § 6-5-120.

261.    "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals." Ala. Code § 6-5-121.

262.    "If a public nuisance causes a special damage to an individual in which the public does not participate, such special damage gives a right of action." Ala. Code § 6-5-123.

263.    The public nuisance caused by the MindGeek Defendants includes the creation of a market and monetization of that market, for child pornography. In so doing, the MindGeek Defendants used their business interests, infrastructure, financial posture, connections, and connection to its audience, to procure, possess, and disseminate child pornography. This

dissemination served to generate and drive tens of thousands of viewers to and among the MindGeek Defendants' free and premium website empire. The MindGeek Defendants knowingly, intentionally, unintentionally, recklessly, and/or negligently disseminated numerous sexually explicit materials of the Plaintiff, a minor, across the internet.

264.    The MindGeek Defendants knew or should have known that their creation of this market, and their procurement, possession and distribution of these materials, would harm the public at large, and also cause special damage to the Plaintiff. Child pornography is illegal, is horribly traumatic to the children depicted, and the creation of a market and/or the failure to regulate the MindGeek Defendants' internet infrastructure which would create a market, is damaging to society as a whole.

265.    The MindGeek Defendants' actions and/or inactions were a substantial factor in child pornography becoming widely available and widely viewed. Without the Defendants' actions, the volume of child pornography on the internet – and the market it has created to procure and disseminate these images – would not have become so widespread, nor would the public health hazard of such information being widely available and published would exist to the degree it does.

266.    The public nuisance created by these MindGeek Defendants has caused, and continues to cause, significant harm to the nation, the State of Alabama, and public as a whole.

267.    At all material times, the MindGeek Defendants possessed the right, ability, knowledge, opportunity, resources, and position to control the dissemination of child pornography on their internet infrastructure. The MindGeek Defendants had the power to obtain consent of all parties; to confirm the ages of all parties; the ability to admit or deny the upload of material for any reason; and/or the ability to confirm or deny the legitimacy and background of all persons uploading information to their sites. The MindGeek Defendants could have, and absolutely should

have, prevented the upload and viewership of child pornography on their websites, and could have and should have prevented the upload and viewership of the Plaintiff.

268.     As a direct and proximate result of their conduct, the MindGeek Defendants have created a public nuisance, as the dissemination of child pornography damages all parties that come within the sphere of its operation.

269.     As a direct and proximate result of their conduct, the MindGeek Defendants' have caused a special damage to the Plaintiff, as the dissemination of child pornography depicting the Plaintiff works a special hurt, inconvenience or damage on the Plaintiff, including his individual and unique severe physical, mental, and emotional trauma for having been the one that was depicted by the MindGeek Defendants.

270.     The nuisance as created by the MindGeek Defendants' conduct is abatable, and further, all special damages incurred by the Plaintiff as a result of the MindGeek Defendants' conduct, including the actual, physical, mental and emotional damages sustained, should be compensated for. These damages include compensatory damages, punitive damages, equitable relief, attorney's fees, litigation costs, and any and all further relief the Court deems appropriate and just.

## COUNT SEVEN

### NEGLIGENCE

### (As to the MindGeek Defendants)

271.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

272.     At all times material to this action, the MindGeek Defendants operated adult websites, internet infrastructure, and/or web-based platform(s).

273.     As the owners, holders, operators, reviewers, supervisors, and/or entities with a business interest in the adult websites, internet infrastructure and/or web-based platform(s), the MindGeek Defendants had a variety of duties, including but not limited to:

- To follow federal and state law concerning the procurement, possession, dissemination, and/or profiting from sexually explicit materials;

- To not use their websites, internet infrastructure and/or web-based platform(s) to disseminate sexually explicit materials of minor children;

- To diligently monitor their websites, internet infrastructure and/or web-based platform(s) to ensure they are not used to upload, post, or disseminate sexually explicit materials of minor children;

- To confirm the consent of all parties depicted in images, videos and/or illicit material published and disseminated on their websites, internet infrastructure and/or web-based platform(s), before such information is published and disseminated;

- To confirm the ages of all parties depicted in images, videos and/or illicit material to be published and disseminated on their websites, internet infrastructure and/or web-based platform(s), before such information is published and disseminated;

- To not further or promote the market for child pornography through their websites, internet infrastructure and/or web-based platform(s);

- To immediately remove any and all depictions of sexually explicit materials of minor children from their websites, internet infrastructure and/or web-based platform(s);

- To immediately inform law enforcement when any individual attempts to upload and/or publish sexually explicit materials of minor children on their websites, internet infrastructure and/or web-based platform(s);

- To invest in human resources, training, collaboration, software, supervision, and management of or concerning their websites, internet infrastructure and/or web-based platforms, to ensure they are properly supervised for sexually explicit materials of minors, and that such materials are promptly removed before they can be published to the public;

- To retain sufficient staffing in order to ensure that Defendants can operate lawfully pursuant to state and federal law;

- To exercise reasonable care in the planning, supervision, management, operation, and execution of their businesses and employees;

- To ensure that their employees and agents exercised reasonable care when acting within the line and scope of their duties for and/or employment of the Defendants;

- To take all reasonable measures so as not to inflict foreseeable harm on others.

274.    The MindGeek Defendants, whether individually or concurrently, breached their duties and failed to exercise reasonable care as reflected above, and as a result, the Defendants were negligent.

275.    As a proximate result of their negligence, the MindGeek Defendants caused, permitted, and/or operated their business(es) in such a way that led to the procurement, possession, production and/or dissemination of sexually explicit material of the Plaintiff.

276.    Moreover, as a consequence of the MindGeek Defendants' negligence, such sexually explicit material of the Plaintiff, a minor child, remained on their platform(s) for months, resulting in tens of thousands of views.

277.    As a proximate result of the MindGeek Defendants' negligence, the Plaintiff suffered traumatic, repeated, and now life-altering sexual violence; personal and physical injuries; past, present and future pain and suffering; past, present and future medical expenses; permanent injuries; severe and permanent mental anguish, disability and emotional distress; loss of the capacity for the enjoyment of life; incidental expenses; consequential damages to be proven at trial; and general damages.

278.    The Plaintiff is entitled to bring this suit pursuant to Alabama and federal law, and seeks all damages to which he may be entitled as a result of the Defendants' conduct and corresponding horrific injuries sustained.

## COUNT EIGHT

### NEGLIGENCE PER SE

### (As to all Defendants)

**279.** Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

**280.** As discussed throughout this Complaint, the Plaintiff was the victim of brutal sexual violence, of which the Defendants encouraged. Moreover, the sexual violence of the Plaintiff was recorded, and then procured and possessed by the Defendants by virtue of a scheme, association, and/or conspiracy with the perpetrator of the sexual violence. The Defendants, through their platform(s), published and disseminated this sexually explicit material of a minor to tens of thousands of viewers for months, thereby driving traffic, generating revenue, and incurring profits from this activity. The Defendants concealed these activities and failed to report these incidents, the identity of Defendant Franklin, and either knowingly or with constructive knowledge, should have known that they were disseminating illegal sexually explicit material of a minor to viewers across the world. The Defendants used the mails and wires of the United States to transact business concerning the possession, publication, and dissemination of sexually explicit material of a minor child. Therefore, for these and all the reasons articulated in this Complaint, the Defendants violated numerous state and federal statutes, including but not limited to the below statutes, and are negligent per se:

- Possession of obscene matter of a minor child, Ala. Code § 13A-12-192(b);

- Possession of obscene matter of a minor child with the intent to distribute, Ala. Code § 13A-12-192(a);

- The film, print, recording, photography, or otherwise production of obscene matter containing a visual reproduction of sexually explicit matter of a minor child, Ala. Code § 13A-12-197;

- The possession and dissemination of child pornography by any means, including visual depictions of children engaged in sexual acts displayed on computers, computer diskettes, and the Internet, Ala. Code. 13A-12-192;

- The rape of a minor child, Ala. Code § 13A-6-61, (a)(1).

- The sodomy of a minor child, Ala. Code § 13A-6-63(a);

- Causing or allowing, through the use of a computer or otherwise, the visual depiction of unlawful sexual conduct of a child, Ala. Code § 13A-6-121.

- The human trafficking and sexual exploitation of a child, as defined and prohibited by the Representative Jack Williams and Merika Coleman Act, Ala. Code § 13A-6-150;

- The failure to report child abuse or neglect, *C.B. v. Bobo*, 659 So. 2d 98, 102 (Ala. 1995);

- The benefiting from a sex trafficking venture in violation of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1591 and 1595;

- The sexual exploitation of children and advertising of child pornography, 18 U.S. § 2251;

- The transport, shipment, dissemination, production, use, possession, sale, and/or depiction of sexually explicit conduct involving a minor child in or affecting interstate commerce, or otherwise engaged in certain activities relating to material involving the sexual exploitation of minors, 18 U.S.C. § 2252, 2255.

- The production, distribution, receipt or possession with the intent to distribute, of a visual depiction of any kind that depicts a minor engaging in sexually explicit conduct, 18 U.S. § 1466A;

- Mail Fraud, by sending or receiving, or by causing to be sent and received, materials via U.S. mail or commercial interstate carriers for the purpose of executing an unlawful scheme to procure, possess, market, drive internet traffic, and/or profit from sexually explicit images of minor children, 18 U.S.C. § 1341;

- Wire Fraud, by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to procure, possess, market, drive internet traffic, and/or profit from sexually explicit images of minor children, 18 U.S.C. § 1343.

- The creation of a dangerous public nuisance, of which caused special damage to the Plaintiff, Ala. Code § 6-5-120, 121, and 123.

281.    As a minor child, and given the type of conduct and damages inflicted, the Plaintiff falls within the class of persons which these statutes were intended to protect.

282.    The harm suffered by the Plaintiff is the type of harm these statutes were intended to guard against.

283.    The Defendants' actions and/or inactions were the sole or concurring proximate cause of the Plaintiff's severe and permanent injuries.

284.    Furthermore, the Defendants (and for purposes of this case, in particular the MindGeek Defendants) had a duty to exercise ordinary care in following state and federal law as pertaining to the actions described in this Complaint.

285.    Failing to follow the state and federal statutes referenced above carries with it the foreseeable risk of severe, permanent injury, or even death, of those persons these statutes were designed to protect.

286.    The Defendants were negligent in failing to adhere to the statutory authority above, thereby creating an unreasonable risk of injury to those class of individuals these statutes were designed to protect, including the Plaintiff.

287.    The Defendants knew of, or with the exercise of due care for the safety of those whose images / likeness are posted on their sites, should have known of the trauma they would cause such as that as suffered by the Plaintiff if the Defendants did not uphold their duties. As a result of their failure to do so, the Plaintiff suffered traumatic injuries.

288.    The Defendants failed to take action to remedy, mitigate or reduce the damage they created to the Plaintiff, and thereby exacerbated the damage to extraordinary levels by continuing to breach their duties over many months.

289.    The harm suffered by the Plaintiff is the type of harm that these statutes were designed to guard against.

290.    The Defendants were and are negligent per se.

291.    As a direct and proximate result of these statutory breaches of duties by the Defendants, the Plaintiff suffered catastrophic and life-altering injuries.

292.    As a direct and proximate result of the acts and/or omissions of the Defendants, as set forth above, the Defendants violated the above-referenced rules, regulations, authority, and/or statutes, and as a result, the Plaintiff suffered traumatic, repeated, and now life-altering sexual violence; personal and physical injuries; past, present and future pain and suffering; past, present and future medical expenses; permanent injuries; severe and permanent mental anguish, disability and emotional distress; loss of the capacity for the enjoyment of life; incidental expenses; consequential damages to be proven at trial; and general damages.

293.    The Plaintiff is entitled to bring this suit pursuant to Alabama and federal law and seeks all damages to which he may be entitled as a result of the Defendants' conduct and corresponding horrific injuries sustained.

## COUNT NINE

### NEGLIGENT HIRING, TRAINING, SUPERVISION, AND RETENTION

### (As to MindGeek Defendants)

294.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

295.    The MindGeek Defendants had a duty to exercise reasonable care in the hiring of all persons who would oversee, supervise, and/or operate their websites, internet infrastructure and/or web-based platform(s) as pertaining to the production and dissemination of adult content.

296.     It is reasonably foreseeable to the MindGeek Defendants that if they fail to exercise reasonable care in the hiring, training, supervision and/or retention of employees, that such individuals while acting in the line and scope of their work may fail to identify and/or cause sexually explicit images of minors to be produced and disseminated to the outside world, thereby causing catastrophic harm to those depicted therein.

297.     Moreover, it is reasonably foreseeable to the MindGeek Defendants that if they fail to exercise reasonable care in the hiring, training, supervision and/or retention of their employees, that such individuals while acting in the line and scope of their work may cause sexually explicit images of minors to continue to remain on their websites, internet infrastructure and/or web-based platform(s) for extended periods, thereby exacerbating the damage to those depicted therein.

298.     It is further reasonably foreseeable to the MindGeek Defendants that if they fail to exercise reasonable care in the hiring, training, supervision and/or retention of employees, that such individuals while acting in the line and scope of their work may cause the MindGeek Defendants' websites, internet infrastructure and/or web-based platform(s) to serve as a breeding ground for child pornography viewership and dissemination.

299.     The MindGeek Defendants had a duty to exercise reasonable care in the hiring, training, supervision, and retention of all employees, so as not to cause foreseeable harm to others.

300.     The MindGeek Defendants, whether individually or concurrently, breached their duties to exercise reasonable care in the hiring, training, supervision and/or retention of employees. They failed to hire, train, supervise and retain those persons necessary to operate their business safely and legally.

301.     The MindGeek Defendants, through these failures, failed to monitor their business and its websites, internet infrastructure and/or web-based platforms, and in so doing, engaged in

an association with a child rapist and published and disseminated horrific sexually explicit material of children.

302.    At all material times, the MindGeek Defendants knew or should have known based on the nature of their business, their past history in operating their business, and the grave potential for exploitation of children through their business, that failure to utilize reasonable care as pertaining to the hiring, training, supervision, and retention of employees, and the overall management and oversight of their online business, would lead to horrific exploitation of children.

303.    As a direct and proximate result of the MindGeek Defendants' conduct and breaches of duty, as set forth above, the Plaintiff suffered traumatic, repeated, and now life-altering sexual violence; personal and physical injuries; past, present and future pain and suffering; past, present and future medical expenses; permanent injuries; severe and permanent mental anguish, disability and emotional distress; loss of the capacity for the enjoyment of life; incidental expenses; consequential damages to be proven at trial; and general damages.

304.    The Plaintiff is entitled to bring this suit pursuant to Alabama and federal law and seeks all damages to which he may be entitled as a result of the Defendants' conduct and corresponding horrific injuries sustained.

## COUNT TEN

### RECKLESS AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (As to all Defendants)

305.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

306.    As described herein, the Plaintiff was a minor child and the victim of sexual violence.

307.    Defendants owed the Plaintiff a duty to exercise reasonable care to prevent images of the Plaintiff's sexual violence from being possessed, produced, and disseminated to the world.

308.    The MindGeek Defendants should have known that by their failure to exercise reasonable care in the performance of owning, managing, operating and/or maintaining their business(es) and/or in their performance of hiring, training, supervising, retention, oversight and/or management of their employees, and/or in the engagement of contractual services or associations with providers of content, that their actions and/or omission would cause the Plaintiff to suffer sever and permanent injuries, and mental and emotional distress.

309.    The Defendants knew or should have known that severe emotional distress would occur if the Defendants disseminated child pornography and sexual violence of CV1 across the world for profit.

310.    The Defendants' conduct was reckless and/or intentional, and extreme and outrageous, in that the public dissemination of sexually violent material of CV1, a minor child, for profit is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in civilized society.

311.    The Defendants' conduct was a cause in fact and a proximate cause of the Plaintiff's severe and permanent mental and emotional injuries and damages further described herein.

312.    As a direct and proximate result of the Defendants' conduct, as set forth above, the Plaintiff suffered traumatic, repeated, and now life-altering sexual violence; personal and physical injuries; past, present and future pain and suffering; past, present and future medical expenses; permanent injuries; severe and permanent mental anguish, disability and emotional distress; loss of the capacity for the enjoyment of life; incidental expenses; consequential damages to be proven at trial; and general damages.

313.     The Plaintiff is entitled to bring this suit pursuant to Alabama and federal law and seeks all damages to which he may be entitled as a result of the Defendants' conduct and corresponding horrific injuries sustained.

## COUNT ELEVEN

### INVASION OF PRIVACY AND WRONGFUL APPROPRIATION OF LIKENESS

### (As to all Defendants)

314.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

315.     The Defendants wrongfully obtained, possessed, produced, and/or disseminated the Plaintiff's sexually explicit images of Plaintiff CV1's molestation and rape to the outside world on its platform(s) for a profit.

316.     Through their actions and/or inactions as described herein, the Defendants have intruded into the Plaintiff's physical solitude or seclusion.

317.     Through their actions and/or inactions as described herein, the Defendants have given publicity to private information about the Plaintiff that violates ordinary decency.

318.     Through their actions and/or inactions as described herein, the Defendants have put Plaintiff CV1 in a false position in the public eye.

319.     Through their actions and/or inactions as described herein, the Defendants have appropriated Plaintiff CV1 and/or CVI's personality for commercial use.

320.     The Defendants, by virtue of their actions, have invaded the Plaintiff's privacy, and have furthermore profited from such wrongful acts.

**321.**    The Defendants' wrongful invasion of privacy and appropriation of the Plaintiff was in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.

**322.**    The Defendants have caused the Plaintiff economic harm in that they have wrongfully pocketed profits, revenues, generated traffic of which has an economic value, and/or have obtained a benefit from their outrageous invasion of the Plaintiff's privacy.

**323.**    Therefore, the Plaintiff is entitled to all damages due to him and recoverable pursuant to applicable law for the Defendants' invasion of privacy and wrongful appropriation of the Plaintiff.

**324.**    The Plaintiff is entitled to bring this suit pursuant to Alabama and federal law and seeks all damages to which he may be entitled as a result of the Defendants' conduct and corresponding horrific injuries sustained.

## COUNT TWELVE

### WANTONNESS / GROSS NEGLIGENCE

### (As to all Defendants)

**325.**    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

**326.**    As discussed in detail above, the Defendants had numerous duties to exercise reasonable care so as to avoid causing foreseeable harm to the Plaintiff.

**327.**    The Defendants carried out their duties in a careless, reckless, and unsafe manner, showing a gross indifference for their duties and the impact they would cause to minor children such as the Plaintiff.

328.    The Defendants' conduct constitutes gross negligence and/or wantonness, which proximately caused, in whole or in part, the sexual victimization of the Plaintiff; the possession, production and dissemination of sexually explicit material of the Plaintiff to the outside world; the continued production and dissemination of sexually explicit material of the Plaintiff for months, therefore continuously exacerbating the harm caused to the Plaintiff; and the Plaintiff's corresponding traumatic and life-altering physical, mental and emotional injuries.

329.    The Plaintiff is entitled to bring this suit pursuant to Alabama and federal law and seeks all damages to which he may be entitled as a result of the Defendants' conduct and corresponding horrific injuries sustained.

## COUNT THIRTEEN

### COMBINED AND CONCURRING CONDUCT / NEGLIGENCE

### (As to all Defendants)

330.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

331.    The Defendants negligence, wantonness and/or other wrongful acts in this case combined and concurred to cause the injuries and damages to the Plaintiff as alleged herein.

## COUNT FOURTEEN

### REQUEST FOR APPOINTMENT OF GUARDIAN FOR LITIGATION PURPOSES

332.    Plaintiffs reallege all preceding paragraphs of the Complaint as if set out here in full.

333.    As a consequence of the nature and corresponding trauma involved in this case, CV1 Mother hereby requests that this Honorable Court appoint a legal guardian to represent the interests of CV1 for purposes of this case. Participation in this case would be mentally traumatic

for CV1 Mother, as she wishes to avoid any further trauma beyond that which she has already experienced as a result of the limited knowledge she has about this case.

334.     CV1 Mother, while acknowledging that she has the legal right to represent CV1 as the legal guardian, hereby waives that right and seeks the Court's appointment of a guardian, who the undersigned believes Valerie Owens of the Parish Law Firm in Montgomery, Alabama, would serve as an appropriate guardian in this matter.

335.     Therefore, CV1 Mother hereby requests this Honorable Court appoint Valerie Owens as a legal guardian to represent the interests of CV1 in this matter.

336.     Moreover, CV1 Mother respectfully requests this Honorable Court approve the retention and attorney contract of the undersigned attorneys.

### PRAYER FOR RELIEF

337.     WHEREFORE, THE PREMISES CONSIDERED, Plaintiff CV1 Mother, as next friend of and on behalf of CV1, a minor child ("Plaintiff"), hereby demands judgment jointly and severally against the Defendants as follows:

A.  That the Plaintiff have a **TRIAL BY JURY** on all counts pleaded herein;

B.  For all compensatory damages as determined by the trier of fact;

C.  For all special and economic damages as determined by the trier of fact;

D.  For all nominal damages as determined by the trier of fact;

E.  For all punitive damages as determined by the trier of fact;

F.  For all remedies and damages as contemplated by 18 U.S.C. § 2252 and 2255 for the Defendants' receipt and distribution of child pornography;

G.  For all remedies and damages as contemplated by 18 U.S.C. §§ 1591, 1595 for the Defendants' benefitting from a sex trafficking venture in violation of the Trafficking Victims Protection Reauthorization Act;

H.  For all remedies and damages as contemplated by the Racketeer Influenced and Corrupt Organizations Act for the Defendants' violations of the Act;

I.  For all remedies and damages as contemplated under the Representatives Jack Williams and Merika Coleman Act, Ala. Code § 13A-6-150-163.

J.  That the trier of fact declare that the Defendants have created a public nuisance as pleaded herein;

K.  For all remedies and damages for the injuries suffered by the Plaintiff as a result of the Defendants' public nuisance;

L.  For attorneys' fees, time, and litigation costs;

M.  For any and all relief as provided by Alabama and/or federal law for the claims referenced herein;

N.  For any other relief that the Court deems appropriate and just under the circumstances.

Respectfully submitted, this 7th day of October, 2022

/s/ J. Parker Miller
J. PARKER MILLER (ASB-7363-H53M)
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.

/s/ Clay Phillips
CLAY PHILLIPS (ASB-1696-X72W)
Clay Phillips Law Firm, LLC

/s/  Houston W. Kessler
HOUSTON W. KESSLR (ASB-9440-121U)
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.

Counsel for Plaintiff

**OF COUNSEL:**

J. Parker Miller
Houston W. Kessler
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.
Overlook II
2839 Paces Ferry Road Southeast, Suite 400
Atlanta, Georgia 30339
Telephone:     (404) 751-1162
Facsimile:      (855) 674-1818
 Parker.Miller@BeasleyAllen.com
 Houston.Kessler@BeasleyAllen.com

218 Commerce Street
Montgomery, Alabama 36104
Telephone:     (800) 898-2034
Facsimile:      (334) 954-7555

Clay Phillips
Clay Phillips Law Firm, LLC
341 Mendel Parkway East
Montgomery, Alabama 36117
Telephone:     (334) 277-8753
 Clay@ClayPhillipslaw.com